# In the United States Court of Federal Claims

No. 12-340
(Filed:  19 January 2022)

```
*****************************************
SAUER WEST LLC, et al.,                  *
                                         *
                    Plaintiffs,          *       Cross-Motions for Partial Summary
                                         *       Judgment; NITU; Motion to Remand;
v.                                       *       Stare Decisis; Discovery; Rails-to-Trails;
                                         *       Fifth Amendment Taking; Causation.
THE UNITED STATES,                       *
                                         *
                    Defendant.           *
                                         *
*****************************************
```

     *Elizabeth A. Gepford McCulley*, Stewart Wald & McCulley LLC, of Kansas City, MO, for plaintiffs.

     *Jessica Michelle Held*, trial attorney, with whom was *Jean E. Williams*, Acting Assistant Attorney General, U.S. Department of Justice, Environment and Natural Resources Division, of Washington, DC, for defendant.

## OPINION AND ORDER

**HOLTE, Judge.**

**Introduction**

     Plaintiffs allege the United States temporarily took plaintiffs' properties for public use without just compensation, in violation of the Fifth Amendment of the United States Constitution.  Plaintiffs filed their motion for partial summary judgment pertaining to liability and the duration of the alleged taking on 18 December 2020, and the government filed a response and cross-motion for summary judgment on 12 February 2021.  The Court held oral argument on the cross-motions for summary judgment on September 23, 2021.  At oral argument the parties were at odds:  plaintiffs argued the railroad abandoned the line before the Notice of Interim Trail Use ("NITU") issued under state law principles, the government argued it did not; plaintiffs argued the railroad has not used the line for railroad purposes in decades, the government argued it has; plaintiffs argued the NITU delayed abandonment, the government argued it did not.  Perhaps most important, the parties disputed whether the railroad intended to abandon the line at the time the STB issued the NITU.  After oral argument, plaintiffs filed a memorandum acknowledging factual and legal disputes concerning the railroad's intent to abandon the line.  For the following reasons, the Court:  (1) denies plaintiffs' motion for partial summary judgment; (2) denies the government's cross-motion for summary judgment; (3) grants plaintiffs' motion for additional discovery; (4) stays consideration of plaintiffs' motion for leave

to refile its motion for partial summary judgment; and (5) stays consideration of plaintiffs' motion to refer the case to the surface transportation board.

## I. Factual Background[1]

At issue is an easement for railroad purposes across plaintiffs' land owned by the Great Western Railway of Colorado, LLC ("GWRC" or "the railroad"). *See* Joint Stipulation at 2, ECF No. 19; Compl. at 3, ECF No. 1. The rail line ("Welty Line") was used to transport sugar beets from farms where they were grown to a nearby town. *See* Pls.' Mem. in Supp. of Mot. for Partial Summ. J. on Liability Exs. E & H, ECF Nos. 62-6 & 62-9. One end of the line was stub-ended, meaning the line stops at a dead-end. Pls.' Mem. in Supp. of Mot. for Partial Summ. J. on Liability Ex. G at 15:17–16:8, ECF No. 62-8. At the stub-end of the line, sugar beets were loaded onto rail cars to be shipped and sold. Sometime around the 1970s, the sugar beet industry the line served evaporated. Tr. 29:20–30:9, ECF No. 159. With no sugar beets to transport, rail traffic ceased, and the line fell into disrepair.

Decades passed without rail traffic. Pls.' Mot. for Partial Summ. J. Ex. A at 4, ECF No. 133-1. The parties dispute whether the railroad abandoned the line under state law or according to the terms of the original conveyances during this period.[2] In any case, the Surface Transportation Board ("STB") maintained its federal regulatory control of the line.

In 2008, the railroad began the federal regulatory process to formally abandon its easement. *Id.* at 2. Within a month the STB granted it permission to abandon the line, Pls.' Mot. for Partial Summ. J. Ex. B, ECF No. 133-2, but a couple months later, the STB temporarily halted the abandonment process by issuing a NITU, giving the railroad and a nearby town time to negotiate a potential trail-use agreement, Pls.' Mot. for Partial Summ. J. Ex. C, ECF No. 133-3. Those negotiations ultimately failed, Tr. 16:1–9; the railroad then requested six consecutive year-long extensions of time to complete the regulatory process. Joint Statement of Fact at 2 ¶ 7, ECF No. 75. With each request, the railroad said it was "exploring alternative options to consummating the abandonment of the rail line, including various public uses of the corridor." *Id.*

---

[1] All facts in this section are undisputed, unless stated otherwise. See Rules of the Court of Federal Claims ("RCFC") 56(a) (requiring a movant for summary judgment to show "there is no genuine dispute as to any material fact"). The Court draws all inferences "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

[2] Plaintiffs raised such arguments in a previous motion for summary judgment, which was later dismissed as moot on the parties' motion. *See* Mot. to Clarify the Docket and to Dismiss Earlier Summ. J. Briefing as Moot, ECF No. 149. The language of the original conveyance raises the question of whether the railroad abandoned the line according to the terms of the deed before it began the regulatory process to formally abandon the line. The relevant deed language says "if . . . the [railroad] shall cease or fail to maintain and operate . . . the said premises shall revert to the [underlying estate]." Pls.' Mem. in Supp. of Mot. for Partial Summ. J. on Liability Ex. H, ECF No. 62-9. Plaintiffs explained in a later filing they agreed to dismiss their previous motion "based on practical considerations pertaining to [part] 2 of *Preseault II* after *Caquelin II* was decided." Pls.' Mot. for Enlargement of Time to Complete Discovery and Then Allow Plaintiffs to Refile Their Mot. for Partial Summ. J. on the Issue of Liability Based on State Law Abandonment Pursuant to Prong 3 of *Preseault II* and Mot. to Refer the Issue of Adverse Abandonment to the Surface Transportation Board for Determination Pursuant to 28 U.S.C. § 1336(b) at 2, ECF No. 157. They added, "it is now evident that factual and legal disputes remain pertaining to state law abandonment prior to the issuance of the NITU . . . ." *Id.*

Ultimately, the railroad never completed the regulatory process to abandon the Welty Line.  Tr. 15:20–25.  In 2014, more than six years after starting the regulatory process and two years after this lawsuit began, the railroad notified the STB of its decision to "reopen the line" and that it would not complete the regulatory process to abandon it.  Joint Statement of Fact at 2 ¶ 8.

## II.  Procedural History

This case began nearly a decade ago in 2012.  *See* Compl., ECF No. 1.  After an initial period of discovery, proceedings were stayed pending plaintiffs' adverse abandonment proceedings before the STB.  *See* Order, ECF No. 77.  A couple years later, plaintiffs withdrew their petition for adverse abandonment and the stay was lifted.  *See* Order, ECF No. 98.  A period of limited discovery began after the stay was lifted, then another brief stay.  *See* Orders, ECF Nos. 98, 116, 118.  After a few more months of discovery, the case was stayed pending the Federal Circuit's decision in *Caquelin v. United States*, 959 F.3d 1360, 1372 (Fed. Cir. 2020).  *See* Orders, ECF Nos. 120, 129.  This case was reassigned to the present judge during the stay.  *See* Order, ECF No. 121.  The Court lifted the stay after the Federal Circuit issued its decision in *Caquelin*, Order, ECF No. 129, and ordered briefing on the parties' summary judgment motions.  *See* Order, ECF No. 132.  The Court then held oral argument on the parties' summary judgment motions.  Order, ECF No. 154.

Shortly after oral argument, plaintiffs filed a motion for further discovery and leave to refile their motion for partial summary judgment on liability based on prior abandonment under state law and to refer the case to the STB for adverse abandonment proceedings.  *See* Pls.' Mot. for Enlargement of Time to Complete Disc. and then Allow Pls. to Refile their Mot. for Partial Summ. J. on the Issue of Liability Based on State Law Abandonment Pursuant to Prong 3 of *Preseault II* and Mot. to Refer the Issue of Adverse Abandonment to the Surface Transportation Board for Determination Pursuant to 28 U.S.C. § 1336(b) ("Pls.' Mot. for Additional Disc. and Leave to Refile Partial Summ. J. Mot."), ECF No. 157.  Briefing on the pending motions is now complete.  *See* Def.'s Resp. to Pls.' Mot. for Enlargement of Time to Complete Disc. and then Allow Pls. to Refile Their Mot. for Partial Summ. J. on the Issue of Liability Based on "State Law Abandonment" Pursuant to Prong 3 of *Preseault II* and Mot. to Refer the Issue of Adverse Abandonment to the Surface Transportation Board for Determination Pursuant to 28 U.S.C. § 1336(b) ("Gov't's Resp. to Pls.' Mot. for Additional Disc. and Leave to Refile Partial Summ. J. Mot."), ECF No. 166; *see also* Pls.' Reply to Def.'s Response to Pls.' Mot. for Enlargement of Time to Complete Discovery and then Allow Pls.' to Refile Their Mot. for Partial Summ. J. on the Issue of Liability Based on State Law Abandonment Pursuant to Prong 3 of *Preseault II* and Mot. to Refer the Issue of Adverse Abandonment to the Surface Transportation Board for Determination Pursuant to 28 U.S.C. § 1336(b), ECF No. 167.

## III.  Relevant Law

Summary judgment is appropriate where the evidence demonstrates there is "no genuine dispute as to any material fact and that the movant is entitled to judgement as a matter of law." RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  A genuine issue is one

that "may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. A fact is material if it might significantly affect the outcome of the suit. *Id.* at 248. In determining if summary judgment is appropriate, a court will draw all inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A party seeking summary judgment bears the burden of establishing the "absence of any genuine issues of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting *Catrett v. Johns-Manville Sales Corp.*, 756 F.2d 181, 184 (D.C. Cir. 1986)).

When the moving party has met this burden, the burden shifts and the nonmovant must point to sufficient evidence to show a dispute exists over a material fact allowing a reasonable fact finder to rule in its favor. *Anderson*, 477 U.S. at 256. The evidence need not be admissible, but mere denials, conclusory statements, or evidence that is merely colorable or not significantly probative will not defeat summary judgment. *Celotex*, 477 U.S at 324.

Congress provided a process to prevent automatic state-law abandonment of rail lines and "preserve shrinking rail trackage by converting unused rights-of-way to recreational trails." *Preseault v. Interstate Com. Comm'n*, 494 U.S. 1, 5 (1990) ("*Preseault I*"). The Federal Circuit explained the process, termed "railbanking," succinctly:

> In order to railbank a corridor, the railroad must first initiate abandonment proceedings before the STB. The party interested in acquiring the corridor must then request that the STB issue a Certificate of Interim Trail Use ("CITU") or a Notice of Interim Trail Use ("NITU"), which will issue if the railroad is willing to negotiate an agreement. If an agreement is reached, the STB suspends the abandonment proceedings, which "shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes." Railbanking thus prevents any state law reversionary interests in the corridor from vesting. If an agreement is not reached, the abandonment proceedings may continue.

*Chicago Coating Co., LLC v. United States*, 892 F.3d 1164, 1167 (Fed. Cir. 2018) (internal citations omitted).

While the Trails Act may effect a taking under the Fifth Amendment, the Supreme Court upheld the constitutionality of the Trails Act because the government provided a process for compensating property owners through the Tucker Act. *Preseault I*, 494 U.S. at 11–12. The Federal Circuit identified the determinative issues for establishing liability: (1) whether the railroad only acquired an easement or fee simple estate; (2) if the railroad only acquired an easement, whether the scope of the easement is limited to railroad purposes; and (3) even if the scope of the easement is broad enough to encompass public recreational trail use, whether the easement terminated before the alleged taking so that the property owners at the time held the property unencumbered by the easement. *Preseault v. United States*, 100 F.3d 1525, 1533 (Fed. Cir. 1996) ("*Preseault II*").

The government takes property under the Trails Act "when a[] NITU is issued and state law reversionary interests that would otherwise take effect pursuant to normal abandonment

proceedings are forestalled." *Caldwell v. United States*, 391 F.3d 1226, 1236 (Fed. Cir. 2004), *holding modified by Hardy v. United States*, 965 F.3d 1338 (Fed. Cir. 2020). The taking, if any, begins with the issuance of the NITU. *Barclay v. United States*, 443 F.3d 1368, 1373 (Fed. Cir. 2006), *holding modified by Hardy*, 965 F.3d 1338. "The issuance of the NITU is the only event that must occur to 'entitle the plaintiff to institute an action.' Accrual is not delayed until a trail use agreement is executed or the trail operator takes physical possession of the right-of-way." *Id.* (internal citations omitted).

In cases where no trail use agreement is reached, a taking still occurs if a NITU issues and forestalls or forecloses the landowner's right to unencumbered possession of the property. *Ladd v. United States*, 630 F.3d 1015, 1025 (Fed. Cir. 2010), *holding modified by Hardy*, 965 F.3d 1338. There is no taking, however, "until the time as of which, had there been no NITU, the railroad would have abandoned the rail line, causing termination of the easement that the NITU continued by law." *Caquelin v. United States*, 959 F.3d 1360, 1372 (Fed. Cir. 2020). Whether a taking has occurred is a question of law with factual underpinnings. *Casitas Mun. Water Dist. v. United States*, 543 F.3d 1276, 1283 (Fed. Cir. 2008). "The property rights of the parties in a rails-to-trails case are analyzed under the relevant state's law . . . ," which in this case is Colorado law. *Caquelin*, 959 F.3d at 1366 (citing *Rogers v. United States*, 814 F.3d 1299, 1305 (Fed. Cir. 2015)).

## IV. The Parties' Arguments for Summary Judgment

### A. Whether the NITU Effected a Taking

Plaintiffs argue the government's authorization of public trail use triggers a categorical physical taking and events occurring after the NITU is issued (e.g., the signing of a trail use agreement, or actions on the part of the railroad or other third parties) are irrelevant to the fact a taking has already occurred. Pls.' Mot. for Partial Summ. J. at 13, ECF 133. They cite the Federal Circuit's decision in *Ladd v. United States* for holding that a taking occurs even when no trail use agreement is reached and the NITU expires, and that the NITU marks the "finite start" of such taking. *Id.* at 10–11 (citing *Ladd*, 630 F.3d at 1025). Plaintiffs emphasize the Federal Circuit's recent decision in *Caquelin* specifically affirmed the rule that a NITU effects a categorical physical taking. *Id.* at 13.

The government does not argue against using a categorical approach in this case. *See* United States' Cross-Mot. for Summ. J. and Resp. in Opp'n. to Pl.s' Mot. for Partial Summ. J. ("Gov't's Cross-Mot. & Resp."), ECF No. 138. Instead, it argues every takings case requires an additional "causation" element—including cases involving a categorical physical taking—and plaintiffs have not proved this element. *Id.* at 11. According to the government, the Federal Circuit clarified in *Caquelin* proof of causation is an essential element in rails-to-trails takings actions. *Id.* at 12 (citing *Caquelin*, 959 F.3d at 1363). The Federal Circuit's clarification in *Caquelin*, as cited by the government, reads: "The NITU does not effect a taking if, even in the absence of a NITU, the railroad would not have abandoned its line (a necessary prerequisite for termination of the easement under state law) during the period of the NITU: in such a case, the NITU takes nothing." *Id.* (quoting *Caquelin*, 959 F.3d at 1363). The government argues the claim must fail because the NITU did not cause Great Western to delay abandonment of the line

(Great Western ultimately decided not to abandon the line) and did not cause the line to be converted into a public trail.  Gov't's Cross-Mot. & Resp. at 15.  The government also argues "[t]o the extent [p]laintiffs urge the Court to infer causation from equivocal, indirect evidence such as the Railroad's original Notice of Exemption, such an inference has been refuted by the Railroad itself.  But even disregarding the Railroad's declaration, inferring causation would be inappropriate at the summary judgment stage because all reasonable inferences must be drawn in favor of the party opposing summary judgment."  *Id*. at 16; *see Traxcell Techs., LLC v. Sprint Commc'ns Co. LP*, 15 F.4th 1121, 1127–28 (Fed. Cir. 2021).

Plaintiffs respond a causation requirement in a rails-to-trails taking case is contrary to existing precedent.  Pls.' Mot. for Partial Summ. J. at 17.  Specifically, plaintiffs argue "*Preseault II* and all of its progeny as set forth in *Caldwell*, *Barclay*, *Illig*, and *Ladd* establishes that a taking occurs when the NITU is issued, which is a *per se* categorical physical taking at that time, and that it is irrelevant that no trail use agreement was reached."  *Id*.  Plaintiffs note "the principle of causation can be and often is an issue in a flooding case or in any regulatory takings case but is not an element in a *per se* categorical physical takings case."  *Id*. at 17 n.30.

Plaintiffs argue the Federal Circuit's discussion of causation in *Caquelin* is inconsistent with existing precedent because it centers on abandonment principles.  Pls.' Resp. to Gov't's Cross-Mot. and Reply in Further Supp. of Pls.' Mot. and Mem. for Partial Summ. J. Pertaining to Causation and the Duration of the Taking ("Pls.' Resp. and Reply") at 7–8, ECF No. 139.  Plaintiffs argue a taking under part 2 of *Preseault II*'s analytical framework does not depend upon abandonment, but rather the difference in *scope* between the easement at issue and the NITU.[3]  *Id*.  According to plaintiffs, "the government conflates preemption and federal abandonment with the notion of causation."  *Id.* at 8.

Plaintiffs also argue the Federal Circuit's clarification in *Caquelin* regarding causation is "both dicta and wrong."  Pls.' Mot. for Summ. J. at 3.  Plaintiffs point to the Federal Circuit's characterization of the discussion as "nothing more than a response to the government's 'request for a clarification' and/or 'a clarification of the legal standard'" and urge the Court to disregard it.  *Id.* at 17–18.  The government counters "determining the legal framework for analyzing [the plaintiff's] claim [in *Caquelin*] was a necessary first step and the Federal Circuit then used that ruling to reach a decision based on the facts in the record.  The discussion of causation in *Caquelin* was not *dicta*."  Gov't's Cross-Mot. & Resp. at 12.

## B.  Whether Plaintiffs Have Shown Causation

Plaintiffs argue *Caquelin* requires "a finding of causation such that there would be no liability for a taking if the 'NITU would not have altered the continuation of the easement during the NITU period—*i.e.*, would not have caused the only alleged taking of property—if the railroad would not have abandoned the rail line during that period even in the absence of the NITU.'"  Pls.' Mot. for Partial Summ. J. at 22.  Plaintiffs contend they "can easily establish

---

[3] For consistency, the Court will use "part" instead of "prong" when referencing the portions of *Preseault II*'s analytical framework.

liability by proving that the railroad would have abandoned the railroad line in the absence of the NITU and during all of the extensions granted to consummate abandonment." *Id.*

According to plaintiffs, the type of evidence sufficient to establish causation includes: (1) the railroad's application to abandon, which according to plaintiffs indicates the railroad's affirmative intent to abandon; (2) the STB's authorization to abandon the line; and (3) the NITU's authorization to remove rails and ties. *Id.* Plaintiffs point to Great Western's original request for permission to abandon the line and their six requests for extensions of time as evidence of their intent to abandon. *Id.* at 23–24. Plaintiffs argue: "The ultimate impact of [Great Western's] intent and conduct meant that, even though no trail use agreement was signed and consummation of abandonment did not occur, the Plaintiffs' reversionary rights were blocked for the entire 6 year period of time. This continued blocking of plaintiffs' reversionary rights would not and could not have occurred but for the federal statutory scheme that allowed it." *Id.* at 24.

The government responds arguing the Court's analysis on causation should focus on a declaration the government submitted for the first time with its cross-motion for summary judgment. Tr. at 91:15–25 (GOVERNMENT: "I think the Federal Circuit wants us to go and look at what the railroad tells us."); Tr. at 94:11–22 (GOVERNMENT: "[T]he only thin[g] that really matters is whether the NITU delayed any abandonment, and we have testimony from the railroad here that it did not, and that's the only thing that matters."). A representative for the railroad provided the declaration which states "the issuance of the NITU did not cause [the railroad] to delay consummation of abandonment of the Welty Line." Sabatini Decl. at ¶ 12, ECF No. 138-1. According to the government, the railroad's declaration in combination with its refusal to consummate abandonment is dispositive. *Id.*; Gov't Resp. & Cross-Mot. for Summ. J. at 15; Tr. at 64:7–15, 91:15–25, 94:11–22. The government also points to the railroad's statement it "invested approximately $86,000 in the Welty Line for capital improvements and track repairs" after the NITU issued. Gov't Resp. & Cross-Mot. for Summ. J. at 15 (citing Sabatini Decl. at ¶¶ 16, 18, 19). The government concludes the railroad's declaration "establishes that the NITU neither led to a trail use agreement (and public trail use), nor caused a delay in abandonment of the railroad corridor by [the railroad]. Consequently, . . . causation cannot be established." Gov't Resp. & Cross-Mot. for Summ. J. at 15.

## C. Duration of the Taking, if Any

Plaintiffs argue the government temporarily interfered with their reversionary rights for more than six years, starting with the issuance of the NITU and ending with the expiration of the STB's final extension of time. Pls.' Mot. for Partial Summ. J. at 25–26. According to plaintiffs, "a taking occurs after the NITU is issued and the Plaintiffs' reversionary rights are blocked during the period it is in effect. Even after the NITU expired, the Plaintiffs' reversionary rights continued to be blocked during the period of time the government's statutory scheme forestalled abandonment." *Id.* at 26. Plaintiffs assert Great Western "abuse[d] . . . the STB's regulatory procedures" by "[seeking] and receiv[ing] several extensions to consummate abandonment []while shopping the line for other public uses[.]" *Id.* at 27 n.57. Plaintiffs allege Great Western has not used or maintained the line since it was reactivated in 2014, and that more than 30 years have passed since the line was last used for rail traffic. *Id.* The condition of the railroad,

according to plaintiffs, is extremely poor; they explain: "In some locations, the rails are actually sticking straight up in the air and pose a hazard . . . . [A]lthough [the railroad has] not actually removed the rails and ties, you can't see them.  You can't even find them.  They're covered up and . . . impassable, unusable."  Tr. at 37:15–22.  While the railroad says it currently uses 4.2 miles of the 6.2-mile Welty Line for "trail operations," Sabatini Decl. at 3 ⸗ 16, plaintiffs allege only about a mile is used to store railcars.  Tr. at 30:6–19.  The remainder, according to plaintiffs, is unused except for a single railcar with an advertisement on its side parked conspicuously near an overpass for drivers on the interstate highway to see.  Tr. at 30:20–31:3 ("[T]his rail line actually goes underneath Interstate 25 as it heads north, and at that location, so all the cars could see it, they placed a rail car on it with an advertisement that the right-of-way was for sale.  And that was the one car out there at mile marker . . . 4.8.").  These are not railroad purposes within the scope of the original easement according to plaintiffs.  Tr. at 31:4–7, 46:3–15.

The government responds "[w]here a trail use agreement is not reached, any taking is necessarily temporary; as explained in *Caquelin* and *Hardy*, it cannot exceed the time period the NITU was in place and its precise duration must be proved."  Gov't's Cross-Mot. & Resp. at 17.  The government would have the Court limit the duration of any taking to the NITU's effective period, from 29 July 2008 to 2 December 2008. *Id.*

Regarding the multiple extensions of time granted by the STB to Great Western after the NITU expired, the government argues:

> [T]he Railroad was authorized to exercise the authority granted to it by the STB to abandon the subject rail line, which, if exercised, would have brought the STB's regulatory jurisdiction over the line to an end.  But Great Western did not exercise their authority.  It has instead elected to retain its property rights and make rail use of the property.  Great Western's use of the rail corridor for purposes within the scope of its easements cannot, as a matter of law, be a taking of Plaintiffs' interests in the corridor, which are subject to that easement.  Accordingly there is no government action that has taken with [sic] Plaintiffs' property rights in the corridor, nor is there any government action that is forestalling or precluding the "reversion" of such rights.

*Id*. at 17.

## V.  The Parties' Arguments on Plaintiffs' Motion for Additional Discovery, Leave to Refile a Motion for Partial Summary Judgment on the Issue of Liability Based on State Law Abandonment, and Referral to the STB for a Determination on Adverse Abandonment

After oral argument on the motions for summary judgment, plaintiffs filed a motion for additional discovery, leave to refile their motion for partial summary judgment on the issue of liability based on state law abandonment, and referral to the STB for a determination on adverse abandonment.  *See* Pls.' Mot. for Additional Disc. and Leave to Refile Partial Summ. J. Mot.

### A.  Plaintiffs' Motion for Additional Discovery

Plaintiffs argue additional discovery is necessary to determine liability under both parts 2 and 3 of *Preseault II*'s analytical framework: (1) whether the scope of the existing easements are limited to railroad purposes and do not contemplate public trail use; and (2) whether the easements terminated before the NITU issued such that the property owners held the property in fee simple unencumbered by the easements.[4]  *Id.* 4–5.  Plaintiffs' motion implicitly acknowledges genuine disputes of material fact concerning the issue of liability.  Referring to oral argument, plaintiffs note:

> [T]he Court spent a considerable amount of time teasing out from the parties a potential causation analysis framework based on Judge Taranto's decision in *Caquelin*[] . . . .
>
> As argued at the hearing, [p]laintiffs interpret Judge Taranto's analysis as confirming that the NITU itself, and the NITU alone, satisfies [p]laintiffs' burden on causation, assuming causation is required at all (again, [p]laintiffs believe it is not).  However, if Judge Taranto's opinion is interpreted as requiring further analysis of causation past the NITU's issuance, and specifically whether the railroad would have abandoned the right-of-way during the NITU's pendency, such an analysis requires discovery on the railroad's actions post-NITU and subsequent briefing on whether those actions (or inactions) qualify as abandonment under Colorado law.  So, the issue of state law abandonment is not only essential to a [part] 3 analysis but it could also prove to be determinative in a [part] 2 analysis, and therefore the parties should engage in proper discovery and briefing.

*Id.* at 5–6.  Notably, plaintiffs seek additional discovery concerning the railroad's pre- and post-NITU actions to demonstrate the railroad's intent to abandon and whether the Welty Line was abandoned under state law.  Plaintiffs contend the railroad's maintenance, operation, or lack thereof would indicate its intent to abandon and whether it satisfied the elements for abandonment under state law.  Plaintiffs also note "any determination of liability in this case, including both or either [part] 2 and [part] 3 [of *Preseault II*], is likely to be appealed to the Federal Circuit."  *Id.* at 6.  According to plaintiffs, additional discovery would complete the record for purposes of appeal.  *Id.*

The government argues the Court should deny plaintiffs' motion to "litigate the irrelevant issue of 'state law abandonment.'"  Gov't's Resp. to Pls.' Mot. for Additional Disc. and Leave to Refile Partial Summ. J. Mot. at 1, ECF No. 166.  The government argues prior abandonment is not possible under the present regulatory scheme, and cites a recent decision, *Burnett v. United*

---

[4] Plaintiffs characterize their motion as a "motion for enlargement of time to complete discovery" under RCFC 6.1.  Pls.' Mot. for Additional Disc. and Leave to Refile Partial Summ. J. Mot. at 1, ECF No. 157.  The last discovery event was completed on 16 November 2018, and while the parties contemplated additional discovery, that discovery was interrupted by multiple stays.  *See* Mot. to Stay, ECF No. 116; Order, ECF No. 118; Order, ECF No. 120; Order, ECF No. 129.  When the last stay was lifted, the parties proceeded directly with briefing their summary judgment motions.  *See* Order, ECF No. 132.  Although discovery never formally closed, the Court believes plaintiffs' motion for an enlargement of time is better characterized as a motion for additional discovery and construes plaintiffs' motion accordingly.

*States*, 154 Fed. Cl. 539 (2021), for support.  *Id.* at 2 ("Prior abandonment as contemplated in [part] 3 of *Preseault II*, simply cannot occur under today's regulatory structure." (citing *Burnett*, 154 Fed. Cl. 539)).  According to the government, state law abandonment principles only apply after the railroad consummates abandonment under federal law and procedures, and the railroad has not consummated abandonment in this case.  *Id.* at 5–6 (citing *Preseault v. Interstate Commerce Comm'n*, 494 U.S. 1, 8 (1990)).  "Because [the railroad] 'never filed a notice of consummation, which would have ended the STB's jurisdiction and completed a full abandonment of the line,'" plaintiff argues, "no abandonment of the line has occurred."  *Id.* at 7.  Thus, in the government's view, "[p]laintiff's request to conduct additional discovery from [the railroad] on their prior abandonment argument under *Presault II* is . . . pointless."  *Id.*

### B.  Plaintiffs' Motion for Leave to Refile Their Motion for Partial Summary Judgment on the Issue of Prior Abandonment Under State Law

Plaintiffs agreed previously to dismiss an earlier motion for summary judgment on liability under the theory that the railroad abandoned the Welty Line under state law before the STB issued the NITU.  *See* Mot. to Clarify the Docket and to Dismiss Earlier Summ. J. Briefing, ECF Nos. 61 and 67 as Moot, ECF No. 149.  With their present motion, plaintiffs request leave to reintroduce their motion for partial summary judgment on the state law abandonment issue after further discovery is complete.  *Id.* at 1, 8.  Plaintiffs explain:

> The dismissal of the summary judgment briefing pertaining to state law abandonment was based on practical considerations pertaining to [part] 2 of *Preseault II* after [*Caquelin*] was decided, and it is now evident that factual and legal disputes remain pertaining to state law abandonment prior to the issuance of the NITU and the alternative path to liability as set forth in [part] 3 of *Preseault*[].

Pls.' Mot. for Additional Disc. and Leave to Refile Partial Summ. J. Mot. at 2.  They also say "[t]he agreement to dismiss the earlier summary judgment briefing was based purely on practical considerations at the time, and all factual and legal issues related to state law abandonment are yet to be determined on the merits."  *Id.* at 4.

The government argues state law abandonment principles are irrelevant.  Gov't Resp. to Pls.' Mot. for Additional Disc. and Leave to Refile Partial Summ. J. Mot.  According to the government, "[p]rior abandonment, as contemplated in [part] 3 of *Preseault II*, simply cannot occur under today's regulatory structure."  *Id.* at 2 (citing *Burnett*, 154 Fed. Cl. 539).

The government cites *Burnett v. United States*—which was decided several months before oral argument in this case—for the first time in its response to plaintiffs' motion to argue state law principles are irrelevant.  *Id.* at 3.  The government argues the federal regulatory structure governing railroad abandonment has changed since *Preseault II*.  *Id.* at 1.  Specifically, the STB now requires a railroad to publicly consummate abandonment with the STB to complete the abandonment process.  *Id.*  This difference, the government contends, prevents the possibility of prior abandonment because federal regulations prevent the railroad from abandoning the line until it formally consummates abandonment with the STB.  *Id.*  The government explains:

> While "[s]tate law generally governs the disposition of reversionary interests," that authority is subject to the federal government's "'exclusive and plenary' jurisdiction to regulate abandonments." *Preseault v. Interstate Commerce Comm'n*, 494 U.S. 1, 8 (1990) (quoting *Chi & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 321 (1981)).  In short, it is only when abandonment of the line occurs under the mandatory federal process that the potential for extinguishment of an easement under state real property law can be triggered.

Gov't's Resp. to Pls.' Mot. for Additional Disc. and Leave to Refile Partial Summ. J. Mot. at 3–4.  According to the government:  "State law principles apply only after the railroad consummates abandonment in accordance with federal law and procedures."  *Id.* at 5–6 (citing *Preseault I*, 494 U.S. at 8; *Caldwell*, 391 F.3d at 1228–29 (recognizing that it is only after the "STB relinquishes jurisdiction over the abandoned railroad right-of-way [that] state law reversionary property interests, if any, take effect"); *Grantwood Vill. v. Missouri Pac. R. Co.*, 95 F.3d 654, 659 (8th Cir. 1996) (recognizing that line is only abandoned "after the ICC [and now the STB] has authorized an abandonment and after the railroad has consummated that abandonment authorization"); *Baros v. Texas Mexican Ry. Co.*, 400 F.3d 228, 234 (5th Cir. 2005) (recognizing that the "STB retains jurisdiction over a railroad  right-of-way until it has been abandoned pursuant to the [regulatory] conditions imposed by the agency" (citation omitted))).  The government argues further, "[t]o the extent [p]laintiffs claim that federal pre-emption itself constitutes a taking, this is a distinct claim that has not been properly pled."  *Id.* at 2.

### C.  Plaintiffs' Motion to Remand the Case to the STB for a Determination on Adverse Abandonment

Plaintiffs ask the court to remand the case under 28 U.S.C. § 1336(b) to the STB for a determination on adverse abandonment.  Pls.' Mot. for Additional Disc. and Leave to Refile Partial Summ. J. Mot. at 9.  Plaintiffs' motion does not specify timing for referral to the STB— they leave the matter to the Court's discretion.  According to plaintiffs, "[t]he issue of abandonment under federal law is intertwined with the issue of the ultimate duration of the taking."  *Id.*  Plaintiffs argue the STB may determine whether a "*de facto* abandonment" has taken place.  *Id.* at 10 (citing *Mod. Handcraft, Inc.—Abandonment in Jackson Cty., Mo*, 363 I.C.C. 969, 1981 WL 22670 (1981)).  They cite a decision by the STB which says "[the STB] will not allow [its] jurisdiction to be used to shield a [railroad] from the legitimate processes of [s]tate law where there is no overriding [f]ederal interest in interstate commerce."  *Id.* at 11 (quoting *Mod. Handcraft*, 363 I.C.C. at 972 (finding no public benefit in preventing state law abandonment in the absence of rail operations for over twelve years and without any attempt to provide rail service)).

The government, on the other hand, argues the Court should not refer the case to the STB "because such a determination is immaterial to the determination of liability in this case— whether the issuance of the NITU resulted in a delay of the railroad's consummation of abandonment and thus a taking of [p]laintiffs' property interests."  Gov't's Resp. to Pls.' Mot. for Additional Disc. and Leave to Refile Partial Summ. J. Mot. at 7.  The government notes plaintiffs already filed and withdrew a previous petition for adverse abandonment and "there is

no impediment to [p]laintiffs' initiating a new adverse abandonment proceeding.  No Court involvement is needed or warranted."  *Id.*

## VI. Whether Causation is a Necessary Element for a Trails Act Taking

### A. The Precedential Effect of *Caquelin* on Part 2 of *Preseault II*

In *Caquelin*, the Federal Circuit characterized its discussion of a causation element in Trails Act cases as a "clarification of the legal standard."  *Caquelin v. United States*, 959 F.3d 1360, 1370 (Fed. Cir. 2020).  Plaintiffs argue the Federal Circuit's "clarification" in *Caquelin* regarding causation is "both dicta and wrong."  Pls.' Mot. for Summ. J. at 3, ECF No. 133.  They refer to the Federal Circuit's characterization of the discussion as "nothing more than a response to the government's 'request for a clarification' and/or 'a clarification of the legal standard'" and urge the Court to disregard it.[5]  *Id.* at 17–18 (quoting *Caquelin*, 959 F.3d at 1370).  The government counters "determining the legal framework for analyzing [the plaintiff's] claim [in *Caquelin*] was a necessary first step and the Federal Circuit then used that ruling to reach a decision based on the facts in the record.  The discussion of causation in *Caquelin* was not *dicta*."  Gov't's Cross-Mot. & Resp. at 12.

The Trails Act "preserve[s] shrinking rail trackage by converting unused rights-of-way to recreational trails" and is subject to the Fifth Amendment Takings Clause.  *Preseault I*, 494 U.S. at 5.  In *Preseault I*, the Supreme Court held, under state law, where the nonuse of a track for railroad purposes would constitute abandonment, the Trails Act takes a new interest in property by superimposing a different easement in place of the old.  *Preseault I*, 494 U.S. at 8.  The Court did not strike down the law, however, because a remedy to obtain compensation for a government taking was available in this court under the Tucker Act.  *Id.*; 28 U.S.C. § 1491(a)(1).  In 1996, the Federal Circuit recognized a Fifth Amendment taking occurs when state law reversionary property interests are blocked with its decision in *Preseault II*.  *Preseault II*, 100 F.3d 1525, 1543 (Fed. Cir. 1996).  Eight years later, the Federal Circuit held in *Caldwell* a taking occurs "when an NITU is issued and state law reversionary interests that would otherwise take effect pursuant to normal abandonment proceedings are forestalled."  *Caldwell*, 391 F.3d at 1236.  The Federal Circuit reaffirmed this holding in *Barclay*, 443 F.3d at 1373, nearly two years later, and again in *Ladd*, 630 F.3d at 1023.  More recently, in *Caquelin*, the Federal Circuit clarified its *Preseault II—Caldwell—Barclay—Ladd* line of precedents explaining causation is a necessary element in rails-to-trails taking cases.  *Caquelin*, 959 F.3d at 1372.

A court of appeals' decision is binding on trial courts within its jurisdiction.  *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1353 (Fed. Cir. 2006).  Thus, the Court of Federal Claims is bound to adhere to the Federal Circuit's precedential decisions, even if the Federal Circuit's interpretation of its own precedential decisions is dicta.  *Cf. Ins. Co. of the W. v. United States*, 243 F.3d 1367, 1372 (Fed. Cir. 2001) (noting even the Supreme Court's dicta interpreting its own precedents may be binding on lower courts).  The Federal Circuit's characterization of its

---

[5] While plaintiffs argue the causation requirement articulated in *Caquelin* should not apply, they also acknowledge this Court is bound to follow the Federal Circuit's clarification.  Pls.' Mot. for Partial Summ. J. at 16 ("Although this Court obviously must follow the direction of the Federal Circuit as enunciated in the second *Caquelin* [o]pinion . . . .").

reasoning in *Caquelin* as a "clarification," however, does not make it dictum.  Dicta are "statements made by a court that are 'unnecessary to the decision in the case, and therefore[,] not precedential (although [they] may be considered persuasive).'"  *Nat'l Am. Ins. Co. v. United States*, 498 F.3d 1301, 1306 (Fed. Cir. 2007) (quoting *Co-Steel Raritan, Inc. v. Int'l Trade Comm'n*, 357 F.3d 1294, 1307 (Fed. Cir. 2004)).  The Federal Circuit in *Caquelin* explained the legal standard on causation, applied the standard to the facts of the case, and concluded the NITU forestalled the landowner's reversionary interests.  *See Caquelin*, 959 F.3d at 1371–73.  The court's application of its causation standard to the facts in *Caquelin* was not a mere aside—it was necessary to the outcome of the case.  *DaimlerChrysler Corp. v. United States*, 361 F.3d 1378, 1384 (2004) ("[I]t is not only the result but also those portions of the opinion necessary to that result by which we are bound." (quoting *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996))).

Judge Taranto explained persuasively in *Caquelin* the Federal Circuit's holdings in *Barclay* and *Ladd* grow out of *Caldwell*, which held "the Fifth Amendment taking, if any, under the Trails Act is accomplished when an NITU is issued and state law reversionary interests that would otherwise [have] take[n] effect pursuant to normal abandonment proceedings are forestalled."  *Caquelin*, 959 F.3d at 1372 (quoting *Caldwell*, 391 F.3d at 1236).  As Judge Taranto explains, the Federal Circuit's line of precedents each incorporate the causation inquiry outlined in *Caquelin. Id.*  The Federal Circuit acknowledged *Caldwell*, *Barclay*, and *Ladd* include language referring to the NITU date as the date of the taking but clarified this "language is better read so as not to run counter both to the fuller formulation and to basic causation principles.  It can be read as a shorthand that applies where no party has pointed to any legally material difference between the NITU date of issuance (or expiration) and a date of abandonment in the but-for world in which there was no NITU."  *Id.*

Plaintiffs contend *Caquelin's* causation requirement is irreconcilable with the *Caldwell— Barclay—Ladd* line of precedents because the taking is a per se categorical physical taking.  Pls.' Mot. for Partial Summ. J. at 16–17.  They argue the issuance of a NITU triggers a per se categorical physical taking which does not require a plaintiff to demonstrate causation.  *Id.* at 18.  The government counters "causation is required in *all* takings cases," and cites several examples of physical takings cases where causation was an element.  Gov't's Cross-Mot. & Resp. at 11 (citing *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1029 (1992); *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 40 (2012); *Fla. Rock Indus., Inc. v. United States*, 18 F.3d 1560, 1565 (Fed. Cir. 1994)).  Plaintiff responds that the government's examples of cases requiring causation are all government-induced flooding cases, the nature of which requires courts to distinguish between isolated instances of flooding (i.e., likened to an occasional trespass) and sustained or periodic flooding amounting to a categorical physical taking.  Tr. at 163:2–15.  According to plaintiffs, the government advocates for a causation element as means to introduce regulatory takings principles to rails-to-trails takings cases—an argument the Federal Circuit has rejected repeatedly.  Pls.' Mot. for Summ. J. at 16–17.

While *Caquelin* cites flooding cases for the proposition that causation is a necessary element in every takings case—and the government's supporting case law includes intermittent flooding cases too—that observation is immaterial.  As Judge Taranto notes in *Caquelin*, causation is a "fundamental principle of takings law."  *Caquelin*, 959 F.3d at 1371.  As with tort

law—from which the law of takings originated—all takings, whether physical or regulatory, require a demonstration the alleged government act caused the property owner's loss. *Id.*; *see Hansen v. United States*, 65 Fed. Cl. 76, 80 (2005); *see also* Richard A. Epstein, *Takings: Private Property and the Power of Eminent Domain* 33–54 (1985). Moreover, this court is bound to adhere to the Federal Circuit's precedents. Accordingly, the Court faithfully applies the Federal Circuit's clarification of its precedents as set forth in *Caquelin*. *See Hardy v. United States*, 965 F.3d 1338, 1349 (Fed. Cir. 2020) (vacating and remaining in view of *Caquelin* to consider whether the NITU would have blocked plaintiffs' reversionary interests).

*Caquelin* clarifies that causation was always an implied element of the Federal Circuit's precedents in *Caldwell*, *Barclay*, and *Ladd* because those cases are based on *Caldwell*'s holding that a "Fifth Amendment taking, if any, under the Trails Act is accomplished when an NITU is issued and state law reversionary interests that would otherwise [have] take[n] effect pursuant to normal abandonment proceedings are forestalled." *Caquelin*, 959 F.3d at 1371 (quoting *Caldwell*, 391 F.3d at 1236). The Federal Circuit applied this holding in, *Barclay*, a Trails Act case involving a statute of limitations issue. *Barclay*, 443 F.3d at 1374. In *Barclay*, the Federal Circuit held a NITU triggers accrual of a Trails Act claim and adverted to the plaintiff's admission that "the easement continued in existence beyond the time when it otherwise would have been abandoned." *Id.* (citation omitted). Then in *Ladd*, the Federal Circuit found a taking under the Fifth Amendment occurred despite a trail-use agreement never being reached because "a takings claim accrues on the date that a NITU issues, events arising after that date . . . cannot be necessary elements of the claim." *Ladd*, 630 F.3d at 1024.

The Federal Circuit considered the evidence available in *Cauquelin* and found, in the absence of evidence affirmatively indicating the railroad did not intend to abandon the line, there was sufficient evidence to support the trial court's ruling granting summary judgment in favor of the plaintiffs. *Caquelin*, 959 F.3d at 1372–73. In *Caquelin*, the Federal Circuit considered the railroad's actions before the NITU ("The railroad filed an application to abandon, indicating an affirmative intent to abandon."), during the NITU ("[I]t refused . . . [to consent to an extension of the NITU], confirming an interest in abandoning sooner rather than later" and removed track during the NITU, "a precondition to abandonment-based easement termination under Iowa law."), and after the NITU ("It completed abandonment just three months after . . . the date . . . it became legally authorized to abandon the line, suggesting a comparable time period had authority been granted [earlier]."). *Id.* at 1373. Accordingly, *Caquelin* clarified that a court must consider events occurring before, during, and after the NITU issues when assessing the railroad's intent at the time of the NITU.[6] *Id.*

---

[6] In understanding the causation requirements of *Caquelin*, it is important to recognize the *Caldwell—Barclay—Ladd—Caquelin* line of precedents falls under part 2 of *Preseault II*'s analytical framework based on the blocking of a landowner's reversionary interests from vesting. *See Caldwell*, 391 F.3d at 1228; *Barclay*, 443 F.3d at 1371; *Ladd*, 630 F.3d at 1023–24; *Caquelin*, 959 F.3d at 1364–65. While *Caquelin* acknowledges causation is a "fundamental principle of takings law," *Caquelin*, 959 F.3d at 1371, the Federal Circuit has not directly addressed how a case based on prior abandonment (i.e., part 3) under *Preseault II* should be analyzed for causation.

**B. Applying *Caquelin*'s Causation Requirement to This Case**

Plaintiffs consistently and emphatically maintain causation is not an element of a Fifth Amendment taking under the Trails Act.  Pls.' Mot. for Partial Summ. J. at 16, 21; Tr. at 103:4–5; Pls.' Mot. for Additional Disc. and Leave to Refile Partial Summ. J. Mot. at 5.  They also argue, however, the NITU caused the alleged taking because the railroad intended to abandon the line when it requested permission to do so, satisfying causation under *Caquelin*.  Pls.' Mot. for Partial. Summ. J. at 24; Tr. at 25:19–26:24 (PLAINTIFFS:  "in the notice of exemption that they filed, the railroad had to file a verified petition stating that they intended to abandon the railroad right-of-way.  And, in fact, they did that . . . .  And then from that point forward, after the discussions between [the local city] and the trail operator expired, then they continually said that they were intending to consummate abandonment in those six yearly [requests for extensions of time] . . . .").  Plaintiffs further allege the railroad continued to delay abandonment to pursue other public trail options; this delay, plaintiffs contend, would not have occurred but for the federal statutory scheme that enabled it.  Pls.' Mot. for Partial. Summ. J. at 24 (The railroad "repeatedly sought extensions to abandon the rail line while they pursued other options, possibly including a different potential trail operator or other public uses.  The ultimate impact of [the railroad's] intent [to enter into a trail-use agreement] meant that . . . consummation of abandonment did not occur . . . ."), 27 ("[S]ince [the railroad] sought and received several extensions to consummate abandonment (while shopping the line for other public uses), the STB's permission to abandon did not expire until . . . [the railroad] . . . decided to reactivate the line."); Tr. at 41:23–43:15 ("COURT:  . . . what was [the railroad's] intent when initially filing the notice of exemption?  [PLAINTIFFS:  I think we have to take them at their word that it was their intent to abandon it, but there had been some discussions with the [nearby city] about the appropriateness of using it as a trail even before they filed their notice of exemption.  And so they were hoping that the City of Johnstown or somebody else would basically take this right-of-way off their hand[s] and convert it to a hiking and biking trail.").  Although plaintiffs maintained they were entitled to summary judgment in their favor, they conceded after oral argument additional discovery is appropriate if the Court finds causation is a necessary element of a Trails Act taking.  Pls.' Mot. for Additional Disc. and Leave to Refile Partial Summ. J. Mot. at 5–6.

The government insists it is entitled to summary judgment based on the available facts without additional discovery.  Gov't Resp. to Pls.' Mot. for Additional Disc. and Leave to Refile Partial Summ. J. Mot. at 2.  The government argues the Court's analysis on causation should center on a declaration the government submitted for the first time with its cross-motion for summary judgment.  Tr. at 91:15–25 (GOVERNMENT:  "I think the Federal Circuit wants us to go and look at what the railroad tells us."); Tr. at 94:11–22 (GOVERNMENT:  "[T]he only thin[g] that really matters is whether the NITU delayed any abandonment, and we have testimony from the railroad here that it did not, and that's the only thing that matters.").  In the declaration, a representative for the railroad states "the issuance of the NITU did not cause [the railroad] to delay consummation of abandonment of the Welty Line."  Sabatini Decl. at ¶ 12, ECF No. 138-1.  According to the government, the railroad's declaration in combination with its refusal to consummate abandonment is dispositive.  *Id.*; Gov't Resp. & Cross-Mot. for Summ. J. at 15; Tr. at 64:7–15, 91:15–25, 94:11–22.  The government also points to the railroad's statement it made $86,000 in repairs and capital improvements after the NITU was issued as

evidence it did not intend to abandon the line but does not identify what repairs or improvements to the line were made. Gov't Resp. & Cross-Mot. for Summ. J. at 15 (citing Sabatini Decl. at ⁋⁋ 16, 18, 19).

At oral argument, however, the government acknowledged the absence of discovery pertaining to the railroad's intent. For example, the government agreed there has been no discovery concerning trail-use negotiations between the railroad and the city, which could reveal the railroad's intent to abandon or convey the easement for public trail use. Tr. 19:7–20:9 ("there is nothing in the record at all as to the negotiation process . . ."); Tr. 24:4–8 ("I agree that there is nothing in the record as to the Town of Johnstown's position throughout the negotiations."). When asked why the railroad filed a notice of exemption but ultimately decided not to abandon the Welty Line, the government had no answer. Tr. 94:11–17 ("COURT: Okay. So what was the railroad's intent? . . . [GOVERNMENT]: At the time they filed their initial request for abandonment? THE COURT: Yeah. [GOVERNMENT]: I do not know what their intent was."). Though, in its view, further discovery is not needed, the government admits further discovery could reveal the railroad's intent. Tr. 20:6–9 (government counsel stating, "Further discovery from the railroad could [elaborate], but it's not needed.").

This case has experienced several bouts of discovery. First, a three-year period of discovery on liability, then a two-year stay pending adverse abandonment proceedings before the STB. *See* Orders, ECF Nos. 9, 60, 77, 98. A period of limited discovery began after the stay was lifted, then another brief stay, a few more months of discovery, all followed by a longer stay pending the Federal Circuit's decision in *Caquelin*. *See* Orders, ECF Nos. 98, 116, 118, 120, 129. After the Federal Circuit issued its decision in Caquelin, the Court noted the parties' request for "a period of 60 days for discovery" and ordered the parties to propose a schedule for further proceedings. Order at 1–2, ECF No. 129. The parties' responded with a proposed schedule limited to briefing their summary judgment motions, *see* Joint Status Report, ECF No. 131, which the Court adopted, *see* Order, ECF No. 132. In sum, the Court lifted the stay on discovery proceedings after the most recent stay, and although the parties did not propose a schedule for further discovery proceedings, discovery is still open. Order at 1, ECF No. 120 (staying discovery pending the Federal Circuit's decision in *Caquelin*); Order at 2, ECF No. 129 (lifting the stay of proceedings in this case).

Discovery produced during those intermittent periods included written discovery, documents, photographs and video of the Welty Line, landowner declarations, and depositions and declarations from railroad employees. Notably, the government submitted a declaration from the interim CEO of the railroad, Mr. Sabatini, for the first time as an exhibit with their cross-motion for summary judgment and response to plaintiffs' summary judgment motion. *See* Sabatini Decl., ECF No. 138-1. The government relies heavily on this declaration in its motion for summary judgment. Gov't Resp. & Cross-Mot. for Summ. J. at 15 (quoting Sabatini Decl. at ⁋12, ECF No. 138-1); Tr. at 64:7–15; Tr. at 91:15–25; Tr. 94:11–22. Plaintiffs have not had opportunity to depose Mr. Sabatini and question him regarding statements he made in the declaration. Tr. 126:9–19 ("COURT: Did you depose the interim CEO? [PLAINTIFFS]: No, I had never heard of him until [the government] filed this affidavit. THE COURT: So you didn't have the opportunity to depose? [PLAINTIFFS]: No. I mean, this came up well after the fact.").

The government must demonstrate there is "no genuine dispute as to any material fact" and it "is entitled to judgment as a matter of law" for its motion to succeed, RCFC 56(c); *Anderson*, 477 U.S. at 247; and they must do this while drawing all reasonable inferences in the light most favorable to plaintiffs. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. A NITU does not cause a taking if, in the absence of the NITU, plaintiffs would not have possessed the allegedly taken property interest. *Caquelin*, 959 F.3d at 1371. Where, as in this case, plaintiffs provide evidence indicating the railroad's affirmative intent to abandon the corridor, the government must point to evidence affirmatively indicating the railroad would have delayed abandonment beyond the NITU period. *See Caquelin*, 959 F.3d at 1373 (holding, in the absence of contrary evidence, no clear error in granting summary judgment in favor of plaintiffs when evidence indicates the railroad affirmatively intended to abandon the line). Events occurring before, during, and after the NITU issues are relevant when assessing the railroad's intent, *id.* at 1372–73, but it is the railroad's intent at the time of the NITU that matters. *Ladd*, 630 F.3d at 1023–24 (holding a takings claim under the Trails Act accrues with the issuance of a NITU, at which point "all events which fix the government's alleged liability have occurred" and events arising after the NITU issues cannot be necessary elements of the claim (quoting *Boling v. United States*, 220 F.3d 1365, 1370 (Fed. Cir. 2000))).

Drawing reasonable inferences in favor of plaintiffs, the railroad's declaration that "[t]he issuance of the NITU did not cause [the railroad] to delay consummation of abandonment of the Welty Line," Sabatini Decl. at 3 (¶ 12), appears to be a retrospective summation of events rather than evidence of the railroad's intent at the time of the NITU—the relevant inquiry here, *see Ladd*, 630 F.3d at 1024. The relevance of the railroad's declaration depends in part on its usefulness for inferring the railroad's intent at the time of the NITU. Here, however, the railroad's statement describes what is already known—i.e., the NITU didn't delay consummation of abandonment because there was none.

The railroad's decision to not consummate abandonment does not weigh heavily in the government's favor either. In its notice to the STB declining to consummate abandonment, the railroad explained it would reopen the line "[d]ue to recent industrial expansion in the area . . . ." Joint Stipulation at 1, ECF No. 74; Def. Ex. 11, ECF No. 67-1. In other words, the railroad decided not to abandon the line because of changing conditions after the NITU issued. This says little, if anything at all, of the railroad's intent at the time of the NITU, which is the Court's inquiry. *Ladd*, 630 F.3d at 1024 ("[A] takings claim accrues on the date that a NITU issues, events arising after that date . . . cannot be necessary elements of the claim.").

Here, as in *Caquelin*, the railroad filed an application to abandon, indicating an affirmative intent to abandon. Notice of Exemption, ECF No. 67-1; *see Caquelin*, 959 F.3d at 1373. The railroad also repeatedly requested extensions of time to consummate abandonment as it "explor[ed] alternative options to consummating the abandonment of the rail line, including various public uses of the corridor." Joint Statement of Fact at 2 ¶ 7, ECF No. 75. Unlike *Caquelin*, the railroad was not asked for its consent to extend the NITU by an "organization interested in operating a trail," *Caquelin*, 959 F.3d at 1365, and there is no evidence the railroad removed track in preparation for abandonment. Tr. at 37:7–14.

The Federal Circuit's precedent in *Caquelin* requires the Court to determine whether, in the absence of the NITU, the landowners would have enjoyed their property unburdened by the railroad easement. *Caquelin*, 959 F.3d at 1373. In contrast, first, the railroad in this case applied to abandon the line and took steps to comply with the regulatory requirements to do so, indicating its affirmative intent to abandon; then, second, the railroad delayed abandonment for several years after the NITU expired. It is not clear from this discordant evidence what the railroad's intent with the Welty Line was; even the government admits it does not know what the railroad intended. When asked why the railroad filed a notice of exemption but ultimately decided not to abandon the Welty Line, the government had no answer. Tr. 94:11–17 (GOVERNMENT: "I do not know what their intent was."). Thus, a genuine dispute of material fact exists concerning whether, in the absence of the NITU, plaintiffs would have possessed their property unencumbered by the railroad easement. RCFC 56(c); *Anderson*, 477 U.S. at 247.

In sum, the parties did not conduct discovery on the railroad's intent to abandon the Welty Line, a material fact, and the little evidence that is available is discordant and insufficient to support granting summary judgment. Further discovery on whether the NITU interfered with plaintiffs' possession of their property unencumbered by the railroad easement is warranted due to the Federal Circuit's intervening clarification of its precedents explaining causation is a necessary element of a taking under the Trails Act.[7] *Caquelin*, 959 F.3d at 1373.

## VII. The Government's Opposition to *Preseault II* Part 3 Related Discovery

In its post-oral argument supplemental briefing, the government cites *Burnett v. United States* for the first time to support its argument a taking based on prior abandonment is not possible under the present regulatory scheme. Gov't's Resp. to Pls.' Mot. for Additional Disc. and Leave to Refile Partial Summ. J. Mot. at 2, ECF No. 166 ("Prior abandonment as contemplated in [part] 3 of *Preseault II*, simply cannot occur under today's regulatory structure." (citing *Burnett v. United States*, 154 Fed. Cl. 539, 544 (2021))). Like the present case, a trail-use agreement was never reached in *Burnett* and the railroad never consummated abandonment of the line in question. *Burnett*, 154 Fed. Cl. at 544. Unlike the present case, however, the railroad in *Burnett* owned some of the plaintiffs' parcels in fee simple—the court granted summary judgment on those claims—and owned an easement which was broad enough to encompass public trail use for the remainder. *Id.* at 542–43. The easements in *Burnett* were broad enough

---

[7] If discovery already closed, to reopen, plaintiffs would be required to file an affidavit or declaration under RCFC 56(d) including the five-part set of prerequisites for relief as described in *Theisen Vending Co. v. United States*, 58 Fed. Cl. 194, 198 (2003). Specifically, plaintiffs must: "(1) specify the particular factual discovery being sought, (2) explain how the results of the discovery are reasonably expected to engender a genuine issue of material fact, (3) provide an adequate factual predicate for the belief that there are discoverable facts sufficient to raise a genuine and material issue, (4) recite the efforts previously made to obtain those facts, and (5) show good grounds for the failure to have discovered the essential facts sooner." *Id.* Reviewing the procedure here, plaintiffs would likely satisfy these prerequisites. Plaintiffs now seek discovery pertaining to the railroad's intent to abandon the Welty Line and to negotiations and actions at the time of the NITU. Pls.' Mot. for Additional Disc. and Leave to Refile Partial Summ. J. Mot. at 1, 5–6. Such discovery could clarify the railroad's intent. Also, the railroad's application to abandon the line and multiple requests for extensions of time signal an affirmative intent to abandon; they also suggest there are additional facts concerning the railroad's intent that may be revealed in further discovery. Lastly, the parties have not conducted discovery on this issue because the Federal Circuit's clarification of precedent came recently in *Caquelin*.

to encompass public trail use, so the plaintiffs did not have reversionary interests based on a change in the nature of the easement under the second part of *Preseault II*—an important fact that distinguishes *Burnett* from the *Caldwell—Barclay—Ladd—Caquelin* line of cases. Instead, the plaintiffs in *Burnett* alleged the railroad abandoned its easement under state law before the NITU issued and the subsequent issuance of the NITU was a taking because it established a public easement that had previously been abandoned (a claim under the third part of *Preseault II*'s analytical framework). *Id.* at 543. In *Burnett*, the court held "plaintiffs' contention that abandonment occurred under Missouri state law puts the cart before the horse. Until the STB relinquishes jurisdiction over a rail line, state law is irrelevant." *Id.* at 548. The railroad "never filed a notice of consummation, which would have ended STB's regulatory jurisdiction and completed a full abandonment of the line. Only then would consideration of state law abandonment factors, such as evidence of an intent to abandon be necessary or possible." *Id.* The Court is not aware of any other case—and the government does not cite another—holding a notice of consummation is required before a rails-to-trails taking can occur under part 3 of *Preseault II*'s analytical framework.

The court in *Burnett* distinguished its holding from *Caquelin* in part because the easement in *Caquelin* was not broad enough to encompass public trail use. *Burnett*, 154 Fed. Cl. at 548–49. This distinguishing feature also accounts for the different outcome in *Ladd*, where the Federal Circuit found a taking occurred even though a portion of the line had not been abandoned under federal law. *Ladd*, 630 F.3d at 1018. In short, the takings claims in *Caquelin* and *Ladd* were based on part 2 of *Preseault II*'s analytical framework (i.e., a change in easement scope), while *Burnett* was based entirely on part 3 (i.e., prior abandonment).

The government urges the Court to deny plaintiffs' motion to "litigate the irrelevant issue of 'state law abandonment.'"[8] Gov't's Resp. to Pls.' Mot. for Additional Disc. and Leave to Refile Partial Summ. J. Mot. at 1. The government's argument, if followed, could create precedent for the proposition that a taking cannot occur under part 3 of *Preseault II*'s analytical framework. This proposition was not raised with any legal support at oral argument or in any previous briefing. The Court hesitates to establish this precedent with such a paucity of briefing on the subject. While *Burnett* appears to be relevant to claims based on prior abandonment under state law, the government first cited the case after oral argument, despite the decision coming three months before oral argument. The present motions for summary judgment are

---

[8] Curiously, the government uses quotation marks around the term "state law abandonment" which seems to suggest the government does not view state law abandonment as legitimate. The Court does not view state law abandonment this way and will assume the government did not intend to convey this meaning with quotation marks because it would signal indifference toward state sovereignty and would be incorrect. Assuming the government is correct that state law abandonment principles are irrelevant here, state law undeniably continues to govern railroad abandonment and related property interests in instances where federal regulatory authority terminates, such as when a railroad consummates abandonment, or the STB grants a landowner's petition for adverse abandonment. *Preseault I*, 494 U.S. at 21–22 (1990) (O'Connor, J., concurring) ("A State may again exercise its regulatory powers once the [STB] authorizes a carrier's abandonment of service, and, thus . . . 'brings [the STB's] regulatory mission to an end.'") (quoting *Hayfield Northern R. Co. v. Chicago & North Western Transp. Co.*, 467 U.S. 622, 633 (1984)). In other words, federal law may preempt state law—it does not eliminate it. *Id.* at 22 (O'Connor, J., concurring) ("Although the [STB's] actions may pre-empt the operation and effect of certain state laws, those actions do not displace state law as the traditional source of the real property interests.") (citing *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003–04, 1012 (1984)).

limited to part 2 of *Preseault II*'s analytical framework (i.e., the easements are limited to railroad purposes and are not sufficiently broad to encompass public trail use), and primary briefing and questions at oral argument were dedicated to the applicability of *Caquelin* to plaintiffs' claims under part 2 of *Preseault II*'s analytical framework. Pls.' Mot. for Summ. J. at 2. As explained *infra*, the Court stays consideration of plaintiffs' motion for leave to refile their motion for summary judgment on the issue of prior abandonment under state law. Accordingly, the Court does not consider *Burnett* to be relevant to the issues presently before it and reserves consideration of *Burnett*.[9]

## VIII.  Staying Proceedings

In the interest of judicial efficiency, the Court stays consideration of plaintiffs' motion to refile their motion for partial summary judgment on liability under part 3 of *Preseault II*'s analytical framework until after discovery pertaining to causation is complete. *Landis v. N. Am. Co.*, 299 U.S. 248, 254–55 (1936) ("[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."); RCFC 83(b). Facts pertaining to causation under *Caquelin* may be relevant to plaintiffs' pending motion to refile its motion for partial summary judgment and vice versa. Therefore, the Court will avoid the risk of unnecessarily duplicating discovery efforts by prematurely granting plaintiffs' motion to refile their motion for partial summary judgment based on part 3 of *Preseault II*'s analytical framework. The Court will allow the parties to conduct limited discovery relating to both issues. Regarding plaintiffs' motion to refer the case to the STB for a determination concerning adverse abandonment, plaintiffs do not specify whether this should take place before or after additional discovery. Accordingly, for judicial economy, the Court stays consideration of plaintiffs' motion to refer the case to the STB until after discovery is complete. *Landis*, 299 U.S. at 254–55.

## IX.  Conclusion

For the forgoing reasons, the Court **DENIES** plaintiffs' motion for partial summary judgment, ECF No. 133, and **DENIES** the government's cross-motion for summary judgment,

---

[9] The government also cites *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985), to support its proposition that no court has found a taking stemming from the assertion of federal regulatory authority over rail line abandonment. *Id.* In *Riverside Bayview Homes*, the Supreme Court considered whether the United States Corps of Engineers could require a landowner to obtain a permit before discharging "fill material" into an adjacent wetland. *Riverside Bayview Homes*, 474 U.S. at 126. The Supreme Court held "the mere assertion of regulatory jurisdiction by a governmental body does not constitute a regulatory taking." *Id.* (citing *Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 293–97 (1981)). The government fails to note the regulatory nature of the alleged taking in *Riverside Bayview Homes*. In that case, the Corps of Engineers regulated the landowner's use of its own property but did not physically appropriate it. *Id.* The case does not support the proposition that the government may regulate a railroad easement to the point that it appropriates the underlying property for the enjoyment of others, i.e., a physical taking. *See Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021) ("Government action that physically appropriates property is no less a physical taking because it arises from a regulation . . . . The essential question is . . . whether the government has physically taken property for itself or someone else—by whatever means—or has instead restricted a property owner's ability to use his own property.").

ECF No. 138.[10]  The Court **STAYS** consideration of plaintiffs' motion for leave to refile its motion for partial summary judgment on liability under part 3 of *Preseault II*'s analytical framework and **STAYS** consideration of plaintiffs' motion to refer the case to the STB for a determination concerning adverse abandonment.  The Court **GRANTS** plaintiffs' motion for further discovery on liability.  The parties **SHALL** file a joint status report on or before **9 February 2022** proposing a schedule for additional discovery and further proceedings consistent with this opinion.[11]

**IT IS SO ORDERED.**

s/ Ryan T. Holte

RYAN T. HOLTE
Judge

---

[10] The Court notes RCFC 56(b) allows a party to file a motion for summary judgment at any time until 30 days after the close of all discovery.  Consistent with this rule, the Court will entertain new motions for summary judgment if filed within 30 days of the close of discovery.

[11] On 3 June 2021, the government filed a motion to consider supplemental authority, ECF No. 145:  *Hardy et al. v. United States*, No. 14-388L (Fed. Cl. April 8, 2021).  On 7 July 2021, plaintiffs filed a motion to consider supplemental authority, ECF No. 148:  *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021).  At oral argument, the parties agreed to withdrawal their opposition to each other's respective motions.  Tr. 7:1–23.  Accordingly, the Court orally **GRANTED** both motions.  *Id.*  The Court also **GRANTS** the government's unopposed motion for extension of time to file a response to plaintiffs' motion to consider supplemental authority, ECF No. 151.  The government's out-of-time response may therefore remain on the docket, although the government's opposition to plaintiffs' motion was withdrawn at oral argument.