# In the United States Court of Federal Claims

No. 12-340
(Filed:  11 October 2023)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |
|---|---|
| SAUER WEST, LLC, *et al.*, | \* |
|  | \* |
| Plaintiffs, | \* |
|  | \* |
| v. | \* |
|  | \* |
| THE UNITED STATES, | \* |
|  | \* |
| Defendant. | \* |
|  | \* |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Reed W. Ripley*, with whom was *Thomas S. Stewart*, Stewart, Wald & Smith, LLC, both of Kansas City, MO, for plaintiffs.

*Brian R. Herman*, Trial Attorney, Natural Resources Section, with whom was *Todd Kim*, Assistant Attorney General, Environment and Natural Resources Division, Department of Justice, both of Washington, DC, for defendant.

## OPINION AND ORDER

**HOLTE, Judge.**

Before the Court are cross-motions for summary judgment on whether and when the Great Western Railway of Colorado abandoned an easement for a railroad across plaintiffs' land. The railway aided the transportation of beets from farms in Colorado until the beet industry ceased operating in the 1970s.  The line served no traffic for decades.  In 2008, the railroad began the Surface Transportation Board regulatory process to abandon the easement.  The regulatory board halted the abandonment to permit rails-to-trails negotiations with a nearby town.  The railroad never completed the regulatory abandonment process, and in 2014 the railroad notified the STB it intended to reopen the line and would not abandon the railway.  Both parties agree this is a very unique takings case:  the line sat unused for decades, yet the railroad later began using it for storage of train cars; there is also tension between Colorado state and federal law regarding abandonment.  Although recent Federal Circuit caselaw implies state law may color the analysis of abandonment, it also suggests even minimal use can evidence lack of intent to abandon.  For the following reasons, the Court denies plaintiff's Motion for Summary Judgment and grants the government's Cross-Motion for Summary Judgment.

## I.    Factual Background

The facts of the case were previously outlined by the Court in its 19 January 2022 Opinion and Order, restated as follows:

> At issue is an easement for railroad purposes across plaintiffs' land owned by the Great Western Railway of Colorado, LLC ("GWRC" or "the railroad"). The rail line ("Welty Line") was used to transport sugar beets from farms where they were grown to a nearby town. One end of the line was stub-ended, meaning the line stops at a dead-end. At the stub-end of the line, sugar beets were loaded onto rail cars to be shipped and sold. Sometime around the 1970s, the sugar beet industry the line served evaporated. With no sugar beets to transport, rail traffic ceased, and the line fell into disrepair.
>
> Decades passed without rail traffic. The parties dispute whether the railroad abandoned the line under state law or according to the terms of the original conveyances during this period. In any case, the Surface Transportation Board ("STB") maintained its federal regulatory control of the line.
>
> In 2008, the railroad began the federal regulatory process to formally abandon its easement. Within a month the STB granted [GWRC] permission to abandon the line, but a couple months later, the STB temporarily halted the abandonment process by issuing a [Notice of Interim Trail Use ("NITU")], giving the railroad and a nearby town time to negotiate a potential trail-use agreement. Those negotiations ultimately failed; the railroad then requested six consecutive year-long extensions of time to complete the regulatory process. With each request, the railroad said it was "exploring alternative options to consummating the abandonment of the rail line, including various public uses of the corridor."
>
> Ultimately, the railroad never completed the regulatory process to abandon the Welty Line. In 2014, more than six years after starting the regulatory process and two years after this lawsuit began, the railroad notified the STB of its decision to "reopen the line" and that it would not complete the regulatory process to abandon it.

*Sauer West LLC v. United States*, 157 Fed. Cl. 619, 623–24 (2022) (citations and footnote omitted).

## II.   Procedural History

The Court also reiterates the procedural posture of the case, in part, from its 19 January 2022 Opinion and Order:

> This case began nearly a decade ago in 2012. *See* Compl., ECF No. 1. After an initial period of discovery, proceedings were stayed pending plaintiffs' adverse abandonment proceedings before the STB. *See* Order, ECF No. 77. A couple years later, plaintiffs withdrew their petition for adverse abandonment and the stay was lifted. *See* Order, ECF No. 98. A period of limited discovery began after the stay

was lifted, then another brief stay.  *See* Orders, ECF Nos. 98, 116, 118.  After a few months of discovery, the case was stayed pending the Federal Circuit's decision in *Caquelin v. United States*, 959 F.3d 1360, 1372 (Fed. Cir. 2020).  *See* Orders, ECF Nos. 120, 129.  This case was reassigned to the present judge during the stay.  *See* Order, ECF No. 121.  The Court lifted the stay after the Federal Circuit issued its decision in *Caquelin*, Order, ECF No. 129, and ordered briefing on the parties' summary judgment motions.  *See* Order, ECF No. 132.  The Court then held oral argument on the parties' summary judgment motions.  Order, ECF No. 154.

Shortly after oral argument, plaintiffs filed a motion for further discovery and leave to refile their motion for partial summary judgment on liability based on prior abandonment under state law and to refer the case to the STB for adverse abandonment proceedings.  *See* Pls.' Mot. for Enlargement of Time to Complete Disc. and then Allow Pls. to Refile their Mot. for Partial Summ. J. on the Issue of Liability Based on State Law Abandonment Pursuant to Prong 3 of *Preseault II* and Mot. to Refer the Issue of Adverse Abandonment to the Surface Transportation Board for Determination Pursuant to 28 U.S.C. § 1336(b) ("Pls.' Mot. for Additional Disc. and Leave to Refile Partial Summ. J. Mot."), ECF No. 157.

*Sauer West*, 157 Fed. Cl. at 324–25.  In January 2022, the Court denied the parties' Motions for Partial Summary Judgment and granted the Motion for Further Discovery.  *Id.* at 639.  On 19 May 2023, plaintiffs filed a motion for contempt and sanctions against non-party GWRC, ECF No. 172.  GWRC filed a motion to quash subpoena and for protective order on 23 June 2022, ECF No. 177.  After briefing the Motion for Sanctions and Motion to Quash, the Court held a status conference on 13 July 2022.  *See* 7 July 2022 Status Conference Order, ECF No. 179.  On 14 July 2022 following the status conference, the Court found as moot the Motion for Sanctions, found as moot the Motion to Quash, and granted the railroad's Motion for Protective Order, ECF No. 181.  On 22 August 2022, the Court entered a scheduling order for briefing on partial summary judgment on causation and state-law abandonment, ECF No. 186.  On 31 March 2023, the parties filed a joint statement of facts, ECF No. 197.[1]

## III.   Relevant Law

### A.   *Preseault II* Framework

The Court previously discussed the legal framework for a taking under the National Trails System Act (Trails Act), Pub. L. No. 90-543, 82 Stat. 919 (codified as amended at 16 U.S.C. § 1241 et seq.), noting:

---

[1] The Joint Statement of Facts is deficient due to the absence of a signature from the government's counsel.  App. E, Rules of the Court of Federal Claims ("RCFC"), ¶ 22 ("Documents requiring signatures of more than one party may be filed via the ECF System: (a) by submitting a scanned document containing all necessary written signatures; or (b) by submitting a document containing an electronic signature for each party ('s/[name of party]') and the filing attorney's representation that the other parties have reviewed the document and consent to its filing.").  Notwithstanding the lack of a signature, the Court accepts the Joint Statement of Facts.

Congress provided a process to prevent automatic state-law abandonment of rail lines and "preserve shrinking rail trackage by converting unused rights-of-way to recreational trails." [*Preseault v. ICC* (*Preseault I*), 494 U.S. 1,5 (1990)]. . . .

. . . .

While the Trails Act may effect a taking under the Fifth Amendment, the Supreme Court upheld the constitutionality of the Trails Act because the government provided a process for compensating property owners through the Tucker Act. *Preseault I*, 494 U.S. at 11–12. The Federal Circuit identified the determinative issues for establishing liability [in a three-part inquiry]: (1) whether the railroad only acquired an easement or fee simple estate; (2) if the railroad only acquired an easement, whether the scope of the easement is limited to railroad purposes; and (3) even if the scope of the easement is broad enough to encompass public recreational trail use, whether the easement terminated before the alleged taking so that the property owners at the time held the property unencumbered by the easement. [*Preseault v. United States* (*Preseault II*), 100 F.3d 1525, 1533 (Fed. Cir. 1996)].

The government takes property under the Trails Act "when a[] NITU is issued and state law reversionary interests that would otherwise take effect pursuant to normal abandonment proceedings are forestalled." *Caldwell v. United States*, 391 F.3d 1226, 1236 (Fed. Cir. 2004), *holding modified by Hardy v. United States*, 965 F.3d 1338 (Fed. Cir. 2020). The taking, if any, begins with the issuance of the NITU. *Barclay v. United States*, 443 F.3d 1368, 1373 (Fed. Cir. 2006), *holding modified by Hardy*, 965 F.3d 1338. "The issuance of the NITU is the only event that must occur to 'entitle the plaintiff to institute an action.' Accrual is not delayed until a trail use agreement is executed or the trail operator takes physical possession of the right-of-way." *Id.* (internal citations omitted).

In cases where no trail use agreement is reached, a taking still occurs if a NITU issues and forestalls or forecloses the landowner's right to unencumbered possession of the property. *Ladd v. United States*, 630 F.3d 1015, 1025 (Fed. Cir. 2010), *holding modified by Hardy*, 965 F.3d 1338. There is no taking, however, "until the time as of which, had there been no NITU, the railroad would have abandoned the rail line, causing termination of the easement that the NITU continued by law." *Caquelin v. United States*, 959 F.3d 1360, 1372 (Fed. Cir. 2020). Whether a taking has occurred is a question of law with factual underpinnings. *Casitas Mun. Water Dist. v. United States*, 543 F.3d 1276, 1283 (Fed. Cir. 2008). "The property rights of the parties in a rails-to-trails case are analyzed under the relevant state's law . . . ," which in this case is Colorado law. *Caquelin*, 959 F.3d at 1366 (citing *Rogers v. United States*, 814 F.3d 1299, 1305 (Fed. Cir. 2015)).

*Sauer West v. United States*, 157 Fed. Cl. 619, 625–26 (2022).

**B.    Summary Judgment**

The Court previously provided the legal framework for summary judgment:

> Summary judgment is appropriate where the evidence demonstrates there is "no genuine dispute as to any material fact and that the movant is entitled to judgement as a matter of law." RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A genuine issue is one that "may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. A fact is material if it might significantly affect the outcome of the suit. *Id.* at 248. In determining if summary judgment is appropriate, a court will draw all inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A party seeking summary judgment bears the burden of establishing the "absence of any genuine issues of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting *Catrett v. Johns-Manville Sales Corp.*, 756 F.2d 181, 184 (D.C. Cir. 1985)).

> When the moving party has met this burden, the burden shifts and the nonmovant must point to sufficient evidence to show a dispute exists over a material fact allowing a reasonable fact finder to rule in its favor. *Anderson*, 477 U.S. at 256. The evidence need not be admissible, but mere denials, conclusory statements, or evidence that is merely colorable or not significantly probative will not defeat summary judgment. *Celotex*, 477 U.S. at 324.

*Sauer West*, 157 Fed. Cl. at 625.

## IV.    The Parties' Arguments for Summary Judgment

Plaintiffs argue summary judgment for plaintiffs is appropriate because the facts show a taking has occurred—the parties stipulated the railroad acquired an easement under Prong One of *Presault II*, and plaintiffs argue Prong Two is met, or alternatively Prong Three is met. *See* Pls.' Mot. & Mem. for Summ. J. ("Pls.' MSJ") at 2–4 & n.3, ECF No. 187. Plaintiffs state, "[t]he government stipulated that the applicable deeds to the railroad conveyed easements limited in scope to railroad purposes ([satisfying Prong One] and [Prong Two] of *Presault II*)." *Id.* at 25. Plaintiffs note, although *Presault II* Prong One and Prong Two are established, they must still meet the causation requirement under *Caquelin*—a requirement they "easily meet." *Id.* at 11 (citing *Caquelin v. United States*, 959 F.3d 1360 (Fed. Cir. 2020)). Plaintiffs alternatively argue the railroad abandoned the rail line under Colorado law around 1979, effecting a taking under Prong Three of *Presault II*. *Id.* at 24.

The government counters summary judgment for the government is warranted because plaintiffs fail to establish government action resulted in a taking under the *Preseault II* framework. *See* Def.'s Resp. to Pls.' Mot. for Partial Summ. J. & Cross-Mot. for Summ. J. ("Gov't Cross-MSJ") at 2, ECF No. 190. First, the government argues plaintiffs do not meet the causation test set forth in *Caquelin*—"[p]laintiffs must prove that in the absence of the NITU,

the [r]ailroad would have abandoned during the period of the NITU." *Id.* at 9 (citing *Caquelin*, 959 F.3d at 1363). The government next asserts Prong Three of *Preseault II* does not apply because federal law preempts state law on railroad abandonment and the railroad here did not abandon under federal law. *Id.* at 23.

## A.    Causation Under the *Caquelin* Framework

Plaintiffs' first argument for finding liability is "under [Prong One and Prong Two] of *Preseault II* (scope of the easement)." Pls.' MSJ at 2. Specifically, plaintiffs maintain: (1) they meet the standard for showing causation under *Caquelin*; and (2) a historic preservation condition does not prevent finding causation. *Id.* at 17–23. The government contends under the correct causation standard pursuant to *Caquelin*, plaintiffs' claims fail. Gov't Cross-MSJ at 12. The government asserts the railroad's "intent is not the test; the causation inquiry is whether the railroad would have abandoned during the period of the NITU absent its issuance." *Id.* at 11. The government also contends the existence of the historic preservation condition prevents a finding of causation as required under *Caquelin*. *Id.* at 13.

### 1.    Plaintiffs' Arguments

Plaintiffs argue "just as in [*Caquelin*] and [*Memmer*], [p]laintiffs easily meet their burden with respect to causation." Pls.' MSJ at 11 (first citing *Caquelin*, 959 F.3d 1360; and then citing *Memmer v. United States*, 50 F.4th 136 (Fed. Cir. 2022)). Plaintiffs assert the relevant inquiry is the railroad's intent at the time the NITU was issued. *See* Pls.' Resp. to Def.'s Cross-Mot. for Summ. J. & Reply in Further Supp. of Pls.' Mot. for Partial Summ. J. ("Pls.' Resp.") at 7, ECF No. 191. Plaintiffs note "the facts of this case are different from *Caquelin*" but contend "GWRC unquestionably intended to abandon the right-of-way when the STB issued the NITU, and that establishes causation." Pls.' MSJ at 17. Plaintiffs first point to the railroad's nonuse of the rail line for 29 years prior to the issuance of the NITU as "conclusively demonstrat[ing] GWRC's intent to abandon at the time the STB issued the NITU." *Id.* Plaintiffs next contend "GWRC's Notice of Exemption, filed on April 16, 2008, determinatively and conclusively established GWRC's intent to abandon at the time of the NITU, as GWRC's verified statement specifically requested permission to abandon from the STB and proposed a consummation date for abandonment on June 5, 2008." *Id.* Plaintiffs assert "GWRC's verified statement requesting abandonment not only sought permission to abandon, but also specifically proposed a consummation date for abandonment on June 5, 2008." *Id.* at 18. Plaintiffs also argue intent to abandon at the time of the NITU's issuance is shown because "after the NITU expired, GWRC requested and received six yearly extensions to consummate abandonment, each time offering no evidence of a likelihood of possible shippers or actual restoration of rail traffic." *Id.* at 17.

Plaintiffs further advance "the STB issued a NITU, which triggered a takings claim under *Preseault II* and its progeny because GWRC intended to abandon at the time of the NITU, as shown through 29 years of non-use and GWRC's verified statement before the STB that it intended to abandon the line." *Id.* at 22. Plaintiffs note "events that occur before the NITU's issuance, during the NITU's pendency, and after the NITU expires are relevant to determine the railroad's intent to abandon at the time of the NITU." Pls.' MSJ at 21. Plaintiffs aver, however, "the railroad's activity since reactivating its line . . . has no bearing on the railroad's intent as of

the NITU's issuance." Pls.' Resp. at 8 (cleaned up). Plaintiffs assert "GWRC's non-use of the Rail Line for 29 years before the NITU's issuance shows the requisite intent to establish causation under *Caquelin*." Pls.' MSJ at 18. In support of plaintiffs' contention the railroad's intent controls, plaintiffs argue "a NITU itself presumptively establishes the railroad's intent to abandon absent clear and affirmative contrary evidence." Pls.' Resp. at 5; *see also id.* at 6 ("[O]nly in unique, clear instances of mistake does a NITU not inherently trigger a taking."). Plaintiffs further argue the government fails to provide any arguments negating intent to abandon at the time of the NITU's issuance. *Id.* at 7. Specifically, plaintiffs argue using the line for rail car storage "is irrelevant and not enough to warrant keeping a rail line within the STB's jurisdiction." *Id.* at 10.

### 2. The Government's Arguments

The government argues "[t]he STB's issuance of the NITU did not result in a taking because absent the NITU, [GWRC] would not have abandoned during the period of the NITU." Gov't's Cross-MSJ at 2. The government disputes plaintiffs' characterization of the relevant inquiry, contending, "the test is not the railroad's intent at the time of the NITU. . . . Rather, . . . the analysis is what the railroad would have done in the absence of the NITU—whether and when the railroad would have abandoned if the STB had not issued a NITU." *Id.* at 10 (emphasis omitted). The government asserts "it would be clearly erroneous for the Court to conclude that, absent a 180-day NITU negotiating period . . . , the railroad would have abandoned, despite the fact [GWRC]: (1) did not do so when it obtained abandonment authority; (2) has kept the line in service; and (3) is expanding its business efforts on the line." *Id.* at 22.

The government distinguishes the instant case from *Caquelin* by noting, here, the town never requested an extension of the NITU negotiating period; the railroad asked for six extensions of its time to consummate abandonment after the NITU expired; and, after six years of extending the deadline, the railroad did not consummate abandonment. *Id.* at 19. The government additionally contends, unlike in *Caquelin*, the railroad here did not attempt to salvage any of the track and instead has put forth "efforts to rehabilitate the Welty Branch and to obtain new rail business." *Id.* at 20. The government also argues "evidence from the railroad shows that it stored cars on the Welty Branch from at least 2007 to 2015. . . . indicating the line's continued use for railroad purposes." *Id.* at 21. The government further asserts the railroad "continued to make repairs to and perform maintenance on the line." Gov't's Cross-MSJ at 21. The government states GWRC "has spent money on rehabilitating the line, has stored cars on the line, and is making efforts to attract new business. Plaintiffs do not dispute any of these facts." Def.'s Reply in Supp. of its Cross-Mot. for Summ. J. ("Gov't's Reply") at 9–10, ECF No. 192. The government contends "[t]hese undisputed facts establish [GWRC] would not have abandoned during the period of the NITU if the STB had not issued it." *Id.* at 10.

### 3. Effect of the Historic Preservation Condition

#### i. Plaintiffs' Argument

Plaintiffs contend "the government attempts to make the same argument regarding the [National Historic Preservation Act ('NHPA')] that th[e] Court decisively already rejected—that

an imposed NHPA condition meant the railroad could not have abandoned the Rail Line during the NITU's pendency, and therefore, causation is not satisfied."  Pls.' Resp. at 1 (citing *Hippely v. United States*, 162 Fed. Cl. 414, 426 (2022), *appeal dismissed per stipulation*, 2023 WL 6393198 (Fed. Cir. 2023)).  Plaintiffs aver "[t]he government does not offer any new argument in this case aside from the fact that the STB imposed the historic preservation condition before, rather than after, the NITU's issuance.  That is a distinction without a difference."  *Id.* at 2.  Plaintiffs assert "[t]hat the NHPA condition came before the NITU is of no consequence; the NITU independently caused a taking, and therefore the government is liable."  *Id.* at 3.  Plaintiffs argue "[t]h[e] Court said it plainly:  'A concurrent NHPA historic preservation condition cannot extinguish what would otherwise be a taking.'"  *Id.* (quoting *Hippely*, 162 Fed. Cl. at 429).  Plaintiffs contend "the NHPA is completely divorced from causation analysis."  *Id.* at 11.

### ii.    The Government's Argument

The government contends the historic preservation condition on the rail line prevented GWRC from abandoning the line during the NITU period.  Gov't Cross-MSJ at 12.  The government argues "[t]he Court's decision in [*Hippely*] does not lead to the conclusion that [p]laintiffs have established causation here."  *Id.* at 14 (citing *Hippely*, 162 Fed. Cl. 414).  The government contends because "*Hippely* was wrongly decided" and the facts of this case are distinguishable from *Hippely*, the Court should not find causation here.  *Id.* at 14–15.  Specifically, the government argues the facts of this case differ from the facts of *Hippely* for two reasons.  First, unlike in *Hippely*, "the STB imposed a historic preservation condition in a separate order that it issued before any trail sponsor even requested a NITU."  *Id.* at 14.  Second, the government notes "in *Hippely* the railroad consummated abandonment thirteen days after the STB removed the historic preservation condition.  Here, [GWRC] never consummated abandonment."  *Id.* (citation omitted).  The government argues because the historic preservation condition predated the NITU and the railroad never consummated abandonment, "this case shows that the NHPA process was separate and apart from the Trails Act process."  *Id.*

Additionally, the government argues "*Hippely* was wrongly decided" for three reasons.  *See* Gov't Cross-MSJ at 15.  First, the government argues "[t]he Court was not free to remove the historic preservation condition to analyze causation."  *Id.* at 16.  "Second, the Court's causation analysis improperly focused on the railroad's intent at the time of the NITU."  *Id.*  Third, "the Court in *Hippely* was wrong to infer any conclusions about causation from *Balagna*."  *Id.* at 18 (citing *Balagna v. United States*, 145 Fed. Cl. 442 (2019)).  The government argues "either because the facts of this case are distinguishable from the facts of *Hippely*, or because of the errors highlighted above, the Court should not conclude that its decision in *Hippely* compels a finding of causation here."  *Id.*

### B.    State-Law Abandonment

#### 1.    Plaintiffs' Arguments

Plaintiffs argue Prong Three of *Preseault II* also creates liability under state-law abandonment.  Pls.' MSJ at 28.  Specifically, plaintiffs argue "*Preseault II* framed [Prong Three] as a break-glass-in-case-of-emergency for landowners [o]n the off chance the underlying

easement encompassed trail use, but it did not foreclose [Prong Three] as a distinct alternative path." Pls.' Resp. at 15.  Plaintiffs contend "[t]he Federal Circuit has several times over reaffirmed [Prong Three] as an alternative path to liability (even in circumstances where the scope of the easement does not encompass trail use)." *Id.* at 13.  "[I]f abandonment of the right-of-way occurred under state law prior to the NITU, *then* a taking occurred based on conversion to a trail." *Id.* at 14 (first citing *Hash v. United States*, 403 F.3d 1308, 1318 (Fed. Cir. 2005); then citing *Preseault II*, 100 F.3d at 1544–46; and then citing *Toews v. United States*, 376 F.3d 1371, 1380–81 (Fed. Cir. 2004)) (emphasis altered).  Plaintiffs contend "the Federal Circuit never truly considered that a landowner would have to bring their claim under [Prong Three] if the scope of the easement did not encompass trail use." *Id.*  Plaintiffs assert if "the easement did not encompass trail use, and the government authorized conversion to trail use, clearly, there was a taking." *Id.* at 14–15.

Plaintiffs additionally argue federal law does not preempt the application of state law for the purposes of analysis under Prong Three because "[t]he entire basis on which a rails-to-trails takings claim is founded is that the STB's actions block state-law reversionary property interests that would otherwise vest in adjacent landowners." *Id.* at 16.  Plaintiffs maintain "[t]he determination of state-law abandonment in [p]laintiffs' takings case must be determined under Colorado law, and it has nothing to do with the fact that federal law preempts the actual abandonment of the right-of-way." Pls.' MSJ at 32.  Plaintiffs state, "[u]nder Colorado law, abandonment occurs when a railroad ceases to use its right-of-way for the purposes for which it was granted, namely, railroad purposes. . . .  GWRC abandoned the Rail Line under Colorado law . . . in 1979 [when] GWRC no longer used the Rail Line for railroad purposes." *Id.* at 24.

### 2.    The Government's Arguments

The government argues "based on the language of *Preseault II* and the court's analysis, the third prong is only applicable where the railroad's easement is broad enough to encompass public trail use." Gov't's Cross-MSJ at 24.  In support of this argument, the government states the circuit in *Preseault II* found the easements were not broad enough to encompass public trail use and "only looked to whether the easements had previously been abandoned 'for [the] sake of argument.'" *Id.* at 23–24 (quoting *Preseault II*, 100 F.3d at 1544).  The government further posits "[t]he Federal Circuit's discussion of [Prong Three] was also arguably *dicta*." *Id.* at 24 n.12.  The government concludes there is "no basis to conduct any analysis under *Preseault II*'s third prong" because "the parties have stipulated that the easements are limited to railroad use." *Id.* at 24.  The government cites *Ellamae Phillips* for the proposition an easement "scope that includes trail use is a prerequisite to examining whether the easement was previously abandoned under *Preseault II*'s framework."  *See* Gov't's Reply at 13 (citing *Ellamae Phillips Co. v. United States*, 564 F.3d 1367, 1373 (Fed. Cir. 2009)).

The government alternatively argues even if Prong Three did apply, it would fail because "[n]o railroad may abandon without the federal government's authorization." Gov't's Cross-MSJ at 25.  The government contends the railroad here could not have abandoned as a matter of law because "Congress has explicitly preempted state law on railroad abandonment." *Id.* at 26 (citing 49 U.S.C. § 10501(b)(2)).  The government asserts if, as plaintiffs argue, state-law abandonment applies, "then Congress has preempted nothing, and . . . rail corridors would be

destroyed and removed from the STB's jurisdiction with no authorization whatsoever." *Id.* at 30. The government quotes *Barclay v. United States*: "Abandonment cannot occur until authorized by federal law . . . . Thus, there could be no abandonment until authorized by federal law." Gov't Reply at 16 (quoting 443 F.3d 1368, 1374 (Fed. Cir. 2006)). According to the government, "[b]ecause [the railroad] did not abandon pursuant to federal law prior to the issuance of the NITU, Plaintiffs cannot establish a taking through *Preseault II*'s third prong." *Id.*

## V.     Whether Prong Two of *Preseault II* is Met

The parties dispute whether Prong Two of *Preseault II* is met and whether causation exists under *Caquelin*. The Court first looks at the factors of intent to abandon analyzed in *Caquelin*. The Court then assesses whether, as a whole, the government has pointed to evidence affirmatively indicating the railroad would have delayed abandonment if there was no NITU. Finally, the Court considers whether the NHPA affects the assessment.

### A.     Whether *Caquelin* Causation is Present

Plaintiffs' argument for *Caquelin* causation rests primarily on the railroad's non-use of the rail line for many years before the STB issued the NITU, which plaintiffs argue shows the railroad's intent to abandon the line. Pls.' MSJ at 17–18. The government disagrees, pointing to several actions by the railroad which allegedly distinguish this case from *Caquelin*. Gov't Resp. at 19–20. The Court previously analyzed the relevant standard for causation as identified in *Caquelin*:

> *Caquelin* clarifies that causation was always an implied element of the Federal Circuit's precedents in *Caldwell*, *Barclay*, and *Ladd* because those cases are based on *Caldwell*'s holding that a "Fifth Amendment taking, if any, under the Trails Act is accomplished when [a] NITU is issued and state law reversionary interests that would otherwise [have] take[n] effect pursuant to normal abandonment proceedings are forestalled." *Caquelin*, 959 F.3d at 1371 (quoting *Caldwell*, 391 F.3d at 1236). . . .

> The Federal Circuit considered the evidence available in *Caquelin* and found, in the absence of evidence affirmatively indicating the railroad did not intend to abandon the line, there was sufficient evidence to support the trial court's ruling granting summary judgment in favor of the plaintiffs. [*Caquelin v. United States,* 959 F.3d 1360, 1372–73 (Fed. Cir. 2020)]. In *Caquelin*, the Federal Circuit considered the railroad's actions before the NITU ("The railroad filed an application to abandon, indicating an affirmative intent to abandon."), during the NITU ("[I]t refused . . . [to consent to an extension of the NITU], confirming an interest in abandoning sooner rather than later" and removed track during the NITU, "a precondition to abandonment-based easement termination under Iowa law."), and after the NITU ("It completed abandonment just three months after . . . the date . . . it became legally authorized to abandon the line, suggesting a comparable time period had authority been granted [earlier].")). *Id.* at 1373. Accordingly, *Caquelin*

clarified that a court must consider events occurring before, during, and after the NITU issues when assessing the railroad's intent at the time of the NITU.  *Id.*

*Sauer West LLC, v. United States*, 157 Fed. Cl. 619, 633–34 (2022); *see also Lowery v. United States*, 2023 WL 4677537, at *8 (Fed. Cl. July 21, 2023) (positively citing *Sauer West* for the proposition "if takings plaintiffs provide evidence indicating the railroad's intent to abandon its corridor, the government must provide evidence affirmatively indicating the railroad would have delayed abandonment beyond the NITU period").  In assessing the events occurring before, during, and after the NITU issuance, *Caquelin* indicated the government "[did] not point to any evidence at all affirmatively indicating that the railroad would have delayed abandonment . . . had there been no NITU to interfere with the grant of authority of abandonment."  *Caquelin v. United States*, 959 F.3d 1360, 1373 (Fed. Cir. 2020).  The government's failure to supply evidence indicating the railroad would have delayed abandonment therefore did not support a contrary conclusion indicating the lower court's factual findings were clearly erroneous.  *Id.* Although the Federal Circuit reserved the question of burden of production or persuasion, *see id.* at 1372, the circuit noted sufficient evidence, if supplied by the government, may have supported a finding the railroad lacked intent to abandon, *id.* at 1373.  In the absence of an affirmative indication the railroad would have abandoned, the government's evidence may therefore support a finding of the railroad's intent to delay abandonment.

    The Federal Circuit recently confirmed the appropriate causation standard for rails-to-trails cases in *Memmer*.  In establishing causation, the appellants in *Memmer* pointed to (1) evidence demonstrating the railroad's intent to consummate abandonment prior to the NITU's issuance, (2) the removal of rails and ties during the pendency of the NITU, (3) evidence the railroad still intended to either consummate abandonment or enter into a trail-use agreement when the NITU expired, and (4) the railroad's ultimate formal consummation of abandonment. *Memmer v. United States*, 50 F.4th 136, 145 (Fed. Cir. 2022).  The circuit noted "the government does not point to any evidence indicating that [the railroad] had changed its mind and wished to continue operating the rail line during the NITU period."  *Id.* at 146.  The circuit affirmed the lower court's finding of liability, holding:

> [I]n order for us to reverse the Court of Federal Claims on causation, we would have to conclude that the facts found by the court are insufficient support for the finding that "[the railroad] had *every intent to abandon the railroad lines during the period of time that the NITU was in effect*, and was prevented from doing so by the existence of the NITU." . . .  We are unable to reach that conclusion, however.

*Id.* at 145 (Fed. Cir. 2022) (emphasis added) (citations omitted).

    In *Sauer West* and *Hippely*, the Court previously determined intent to abandon is evaluated at the time of the NITU.  "Events occurring before, during, and after the NITU issues are relevant when assessing the railroad's intent, but it is the railroad's intent at the time of the NITU that matters."  *Sauer West, LLC v. United States*, 157 Fed. Cl. 619, 636 (2022) (citations omitted).

In [*Caquelin*], the Federal Circuit stated the causation standard is "straightforward" and there is no causation "if the railroad would not have abandoned the rail line during that period even in the absence of the NITU." [*Caquelin*], 959 F.3d at 1371. To answer the question of causation, the Court must look to the intent of the railroad at the time of the NITU. *See* [*Ladd v. United States*, 630 F.3d 1015, 1023–24 (Fed. Cir. 2010)]; *Sauer West*, 157 Fed. Cl. at 636. "Events occurring before, during, and after the NITU issues are relevant when assessing the railroad's intent." *Id.* (citing *Caquelin*, 959 F.3d at 1372–73).

*Hippely v. United States*, 162 Fed. Cl. 414, 423 (2022), *appeal dismissed per stipulation*, 2023 WL 6393198 (Fed. Cir. 2023); *see also Lowery*, 2023 WL 4677537, at *10 (agreeing *Hippely*'s "analysis is sound" and reiterating "if compensation is owed when only part of the NITU period is encumbered by a historic preservation condition, then the entire NITU period should be compensable, even if the condition extends beyond the NITU's duration" (citing *Hippely*, 162 Fed. Cl. at 146)). The Welty line has a long history spanning from its inception in the early 1900s to present. Pls.' MSJ at 4–7. While history can certainly inform the Court about intent, as plaintiffs stated at oral argument, "the further you get away from the actual NITU period, the less weight that carries." 26 Apr. 2023 Corrected Oral Arg. Tr. ("Tr.") at 179:1–3, ECF No. 204. The relevant inquiry for causation under *Caquelin* is the railroad's intent as of the NITU's issuance or whether, in the absence of the NITU, the railroad would have abandoned during the period of the NITU. "To answer the question of causation, the Court must look to the intent of the railroad at the time of the NITU." *Hippely*, 162 Fed. Cl. at 423 (first citing *Ladd*, 630 F.3d at 1023–24; and then citing *Sauer West*, 157 Fed. Cl. at 636). The Court accordingly does not look at the time of the NITU in a vacuum but instead the "[e]vents occurring before, during and after" the STB issued the NITU in 2008. *See Sauer West*, 157 Fed. Cl. at 636 (citing *Caquelin*, 959 F.3d at 1372–73).

In *Caquelin*, the Federal Circuit pointed to five factual indicia driving its causation determination: (1) a notice of exemption indicating an affirmative intent to abandon; (2) a refusal to consent to extension of the NITU; (3) actual consummation of abandonment; (4) the NITU's authorization to remove track; and (5) the preconditions for abandonment under state law. *Caquelin*, 959 F.3d at 1373. Based on its analysis of these five factual indicia as well as the government's failure to show the railroad would have delayed abandonment but for the NITU, the court concluded "had there been no NITU, the railroad would have completed abandonment." *Id.* While the facts of *Caquelin* are distinct from the factual history of the Welty line here, the parties agree the non-exhaustive list in *Caquelin* is a good "jumping-off point" for the causation analysis and in determining the intent of the railroad.[2] The Court accordingly analyzes causation by reviewing each of the five factual indicia in *Caquelin* as well as the government's proffered evidence of the railroad's intent to delay abandonment.

### 1.    The Notice of Exemption

---

[2] Tr. at 129:2–19 ("THE COURT: Is that a fair jumping-off point for this case? [PLAINTIFFS]: Yes. . . . [THE GOVERNMENT]: I think generally I'm in agreement with Plaintiffs. I agree that those are the five pieces of evidence that the Court of Appeals identified in *Caquelin*. I don't know that it's exhaustive, there could be others, but I think that's a fair framework to look at."); Tr. at 147:11–13 ("[THE GOVERNMENT]: . . . There's certainly nothing in *Caquelin* which says this is exhaustive, these are the factors.").

The first factor the Federal Circuit analyzed in *Caquelin* and the Court analyzed in *Hippely* is the filing of an application to abandon, which indicated an affirmative intent to abandon. *Caquelin*, 959 F.3d at 1373 ("The railroad filed an application to abandon, indicating an affirmative intent to abandon."); *see Hippely*, 162 Fed. Cl. at 423. The railroad filed a Notice of Exemption on 16 April 2008. Notice of Exemption at 1, ECF No. 187-4. The application requests

> to use the class exemption at 49 C.F.R. § 1152.50 *to abandon its Welty Branch* located between milepost 0.0 at Johnstown, Colorado and milepost 6.2 at Welty, Colorado, totaling approximately 6.2 miles. *There has been no local traffic on the Line in over 20 years.* The Line is stub-ended and not capable of handling overhead traffic.

Notice of Exemption at 4 (emphasis added).

While the Notice of Exemption itself is not disputed, the parties dispute the appropriate weight the Court should give to the Notice of Exemption. *See* Tr. at 132:8–17. Plaintiffs suggest the filing of the Notice of Exemption is the ultimate showing of intent to abandon and the Court must "take the railroad's word" it intended to abandon the line. Tr. at 185:25–186:9 ("[PLAINTIFFS]: We have to take the railroad's word for what it is. They said . . . give us abandonment authority, notwithstanding whatever we've done in the past. We're ready to abandon this line."). The government argued "the railroad can't be held" to statements made in the Notice of Exemption given the future acts of the railroad and the regulatory scheme of the STB. Tr. at 182:7–21 ("[THE GOVERNMENT]: . . . April 2008 . . . they filed the exemption petition saying that we have not used it for 20 years. I don't think . . . we can push that forward to say the railroad was also telling the STB . . . that the future use would not be used. In April, the railroad can't be held to have said anything we do from here on out is not use of the line."). The government suggested statements within the Notice of Exemption are meaningless for determining intent because a Notice of Exemption is required to not just enter into a trail use agreement but also to start the process of disposing of the line, including selling the line. Tr. at 198:9–20 ("[THE GOVERNMENT]: . . . [T]he potentiality for [shopping around] is essentially a factor that weighs against intent to abandon in the filing of the exemption petition, because it can trigger other potential outcomes, such as offers of financial assistance and sales of the line."). The Notice of Exemption, according to the government, is a necessary consequence of how the STB functions and is not indicative of the underlying intent of the railroad. Tr. at 199:2–6. Plaintiffs agree the Notice of Exemption is key to beginning the process of disposing of the line, whether through a trail agreement or not. Tr. at 197:13–22 ("[PLAINTIFFS]: [Railroads] view these types of lines as an asset, and they don't want to let them go without making some sort of money. That's why they filed a notice of exemption, because they thought, well, we can go through this process, we intend to abandon, we can negotiate trail use and get some money from the Town of Johnstown.").

In this multifactor analysis, it is undisputed the railroad communicated an intent "to abandon its Welty Branch" in the Notice of Exemption.  Notice of Exemption at 4.  Absent evidence supporting a contrary interpretation, the statement's plain language does indicate the railroad's intent to abandon.  As in *Caquelin*, the Notice of Exemption factor therefore weighs in favor of plaintiff.  *Cf. Caquelin*, 959 F.3d at 1373 ("In the absence of contrary evidence, this evidence suffices to support an inference that, had there been no NITU, the railroad would have completed abandonment during the period in which the NITU was in effect.").

## 2.    Extension of the NITU Period

The second factor considered in *Caquelin* and *Hippely* was the railroad's request "for consent to an extension of the [NITU] expiration date, [or refusal, which] confirm[s] an interest in abandoning sooner rather than later."  *Caquelin*, 959 F.3d at 1373.  Declining an extension may indicate the railway intended to abandon the line quickly.  The railroad did not decline an extension here, however.  The NITU issued on 28 July 2008 exempted abandonment of the railway for 180 days from 5 June 2008 until expiration on 2 December 2008.  NITU at 1–2, ECF No. 187–6; Joint Statement of Facts ("JSF") at 3 (No. 6).  Unlike in *Caquelin*, neither the railroad nor the town requested an extension of the NITU beyond the 2 December 2008 date. *Id.*; *see also Caquelin*, 959 F.3d at 1365.  If the railroad had requested a NITU extension or declined an extension, this factor may indicate the railroad's intent promptly abandon or its intent to delay abandonment; without such evidence, however, this factor cannot support either party.  While consent to a NITU extension gave rise to an inference of prompt abandonment in *Caquelin*, it is not present here and is therefore a neutral factor.  *See id.* at 1373 ("When [the railroad] was asked for consent to an extension [of the NITU], it refused, confirming an interest in abandoning sooner rather than later . . . ."); *id.* ("The government does not point to any evidence . . . affirmatively indicating that the railroad would have delayed abandonment . . . had there been no NITU to interfere with the grant of authority of abandonment . . . .  In the absence of any such evidence, there is no clear error in a contrary finding on the evidence of record in this case."); *see also Sauer West*, 157 Fed. Cl. at 633–34; *Lowery*, 2023 WL 4677537, at *10 (citing *Sauer West* for the proposition the government must provide evidence affirmatively indicating the railroad would have delayed abandonment).

## 3.    Timing of Actual Consummation of Abandonment

The third factor *Caquelin* considered was the timing of actual abandonment.  *Id.* at 1373. In *Caquelin*, the railroad completed abandonment just three months after it could legally abandon.  *Id.*  Once the STB provides the railroad with authority to abandon—after any NITU period and NITU extensions—the railroad may signify its consummation of abandonment by filing a notice within one year.  49 C.F.R. § 1152.29(e)(2) (2022).  The railroad may request an extensions of time for the consummation of abandonment for good cause shown.  *Id.*  Here, the railroad has yet to abandon despite the STB granting it six one-year extensions for authorization to consummate abandonment.  19 May 2009 Request for Extension, ECF No. 187-7; 22 Apr. 2010 Request for Extension, ECF No. 187-8; 12 Apr. 2011 Request for Extension, ECF No. 187-9; 16 Apr. 2012 Request for Extension, ECF No. 187-10; 17 Apr. 2013 Request for Extension, ECF No. 187-11; 16 Apr. 2014 Request for Extension, ECF No. 187-12.  The railroad could have consummated abandonment while it had authorization to abandon; without authorization,

the railroad could not legally abandon the line.  *See* ICC Termination Act of 1995, 49 U.S.C.
§ 10501(b) (2015).  Each request for extension of the consummation deadline stated GWRC was
continuing to explore "*alternative options to consummating the abandonment of the rail line*,
including various public uses of the corridor."  19 May 2009 Request for Extension (emphasis
added); 22 April 2010 Request for Extension; 12 April 2011 Request for Extension; 16 April
2012 Request for Extension; 17 April 2013 Request for Extension; 16 April 2014 Request for
Extension.  On 28 August 2014, the railroad informed the STB "[d]ue to recent industrial
expansion in the area, GWRC . . . has decided to reopen the line that was authorized for
abandonment in this proceeding."  28 Aug. 2014 Letter to STB at 1, ECF No. 187-13.
Additionally, the railroad affirmatively declared "GWRC will not be consummating the
abandonment" and instead reopened the line.  *Id.*; *see* JSF at 3 (No. 10) ("August 28, 2014:
Instead of consummating abandonment, GWRC notified the STB that it had 'decided to reopen
the line.'" (quoting 28 Aug. 2014 Letter to STB at 1)).

The parties disagree on whether consummation of abandonment must occur.  At oral
argument, plaintiffs, citing *Memmer*, 50 F.4th 136, argued eventual abandonment is not
necessary.  *See* Tr. at 150:1–152:25 ("[PLAINTIFFS]: . . . the [Federal] Circuit's decision [in
*Memmer*] did not turn on the fact that they eventually consummated abandonment and then, in
fact, rejected the idea that [consummating abandonment] was necessary at all.").  The
government, in contrast, asserted the *Caquelin* analysis requires the railroad to eventually
abandon the line.  *See id.* ("[THE GOVERNMENT]: . . . [S]ince *Caquelin* came down, there are
no cases in which railroad use has continued and the railroad has at least claimed it's reactivating
the line and maintaining it in service . . . .").  The government reasoned the fact the railroad was
legally authorized to abandon for six years, yet never did, weighs against causation under
*Caquelin*.  Tr. at 136:14–16 ("[THE GOVERNMENT]: . . . Throughout those six years, they
were legally authorized to abandon the railroad line, and they didn't.  So I think that runs counter
to the factual circumstances of *Caquelin*.").

The Federal Circuit recently confirmed eventual abandonment is not required for a
taking.  *Memmer*, 50 F.4th at 145.  In *Memmer*, the STB issued a NITU after the railroad filed a
notice of exemption.  *Id.* at 141.  The NITU eventually expired without reaching a trail-use
agreement, and the railroad subsequently failed to file a notice of consummation of abandonment
within sixty days of the NITU expiration as required for abandonment.  *Id.*  Seven years later, the
railroad filed a new notice of exemption.  *Id.*  No third party intervened, and the railroad filed a
notice of consummation.  *Id.*  The government argued, like it does here, "when the railroad does
not abandon the line and easements do not terminate after the NITU period, no government
action . . . can be said to have caused a delay, and therefore no temporary taking has occurred."
*Id.* at 144 (internal quotation marks omitted) (citation omitted).  The Federal Circuit rejected the
government's argument and held a "'mandated' or 'compelled' continuation of an easement can
occur regardless of whether the NITU ultimately leads to a trail-use agreement or the railroad's
abandonment is ultimately consummated."  *Id.* at 145.  In its previous Opinion and Order, the
Court noted,

The railroad's decision to not consummate abandonment does not weigh heavily in
the government's favor either.  In its notice to the STB declining to consummate
abandonment, the railroad explained it would reopen the line "[d]ue to recent

industrial expansion in the area . . . ."  [JSF] at 1, ECF No. 74; Def. Ex. 11, ECF
No. 67-1.  In other words, the railroad decided not to abandon the line because of
changing conditions after the NITU issued.  This says little, if anything at all, of the
railroad's intent at the time of the NITU, which is the Court's inquiry.  *Ladd*, 630
F.3d at 1024 ("[A] takings claim accrues on the date that a NITU issues, events
arising after that date . . . cannot be necessary elements of the claim.").

*Sauer West*, 157 Fed. Cl. at 636.

Quick abandonment following the expiration of the NITU may indicate intent to abandon
during the NITU period, as it did in *Caquelin*.  *See* 959 F.3d at 1373.  On the other hand,
*Memmer* indicates a taking "can occur regardless of whether the NITU ultimately leads to . . . the
railroad's [consummation of] abandonment."  50 F.4th at 145.  In this case, the railroad did not
abandon immediately after the NITU expired and the NHPA condition was lifted, so there is no
consummation to support an inference of the railroad's intent to quickly abandon.  Although a
taking can occur even in the absence of the NITU leading to abandonment, there still must be
facts indicating "had there been no NITU, the railroad would have abandoned."  *See Caquelin*,
959 F.3d at 1372; *Sauer West*, 175 Fed. Cl. at 634 (considering events before, during, and after
the NITU).  GWRC never formally abandoned the railway, so the timing of abandonment factor
cannot weigh in favor of abandonment.  The railroad reactivated the line instead and did not
consummate abandonment, further weighing against a finding of causation under *Memmer*.  The
*absence* of eventual abandonment here—unlike the *presence* of actual abandonment in *Memmer*
and *Caquelin*—cannot indicate the railroad would have abandoned the line in absence of the
NITU.  The railroad did not abandon the line after the NITU period, and the actual abandonment
factor therefore supports the government.  *See Caquelin*, 959 F.3d at 1373; *Memmer* 50 F.4th at
145.

### 4.    Authorizations in the NITU

The fourth factor considered in *Caquelin* was whether the NITU itself authorized the
removal of track.  *Caquelin* at 1373 ("The statute itself provides generally for authorization to
remove track during the NITU, an authorization that was included in the NITU here, suggesting
an expectation of comparatively prompt completion of abandonment.").  The NITU in this case
stated "GWRC may discontinue service and salvage track and related materials, to the extent the
salvage activities are not prohibited by the previously imposed historic preservation condition."
NITU at 3.  The NITU also acknowledged "The Board's Section of Environmental Analysis
(SEA) served an environmental assessment (EA) on May 9, 2008, recommending that a historic
preservation condition be imposed on the proposed abandonment.  By decision serviced on June
4, 2008, the exemption was made subject to that condition."  *Id.* at 1 n.1.  The 4 June 2008
decision stated:

[T]he exemption of the abandonment of the line described above is subject to the
condition that GWRC shall retain its interest in and take no steps to alter the historic
integrity of all sites, buildings, and structures within the project right-of-way that
are eligible for listing or listed in the National Register (generally, 50 years old or
older) until the section 106 process of the NHPA, has been completed.  GWRC

shall report back to the SEA regarding any consultations with the [State Historic Preservation Officer] and any other section 106 consulting parties, and shall not file its consummation notice or initiate any salvage activities related to abandonment (including removal of tracks and ties) until the section 106 process has been completed and the Board has removed this condition.

*Great W. Ry. of Colo., LLC—Abandonment Exemption—in Weld Cnty., CO*, No. AB-857 (Sub-No. 1X), 2008 WL 2271470, at *1n.2 (STB June 4, 2008).  In other words, the railroad could not remove the track until the NHPA condition was lifted on 23 March 2009.  JSF at 3 (No. 8) ("March 23, 2009:  The STB removed the Section 106 historic preservation condition."); *Great W. Ry. of Colo., LLC—Abandonment Exemption—in Weld Cnty., CO*, No. AB-857 (Sub-No. 1X), 2009 WL 755237, at *1 (STB Mar. 23, 2009).

The parties disagree on whether the NITU's conditional authorization for track removal weighs in favor of causation.  Plaintiffs assert because the NITU authorized removal of track (although conditionally) there was "an expectation of comparatively prompt completion of abandonment," as in *Caquelin*.  Tr. at 139:2–7 (quoting *Caquelin*, 959 F.3d at 1373).  The government argues the authorization of removal of track is not equivalent to the authorization in *Caquelin*.  Tr. at 137:21–138:16 ("[THE GOVERNMENT]: . . . [W]e don't agree that the NITU authorized the removal of track in the same way. . . .  [W]hat the NITU here said is that GWRC may discontinue service and salvage track and related materials to the extent the salvage activities are not prohibited by the previously imposed historic preservation condition . . . .").  In *Caquelin*, the NITU included an authorization to remove track during its pendency.  *See Caquelin*, 959 F.3d at 1373.  The Federal Circuit found the authorization suggested expectation of prompt abandonment.  *Id.*  In this case, however, the NITU referenced the historic preservation condition preventing track removal.  NITU at 1n.1 (citing *Great W. Ry.*, 2008 WL 2271470).  *Caquelin*'s NITU did not include a preservation condition.  Even though, standing alone, a track-removal authorization might imply an expectation of prompt abandonment, it cannot in this case because the NITU references a historical condition preventing track removal.  *Id.*  A NITU track-removal authorization in this case therefore cannot support a finding of intent to promptly abandon.  At the same time, the government has not pointed to any evidence related to the NITU's historical condition indicating the railroad would have delayed abandonment absent the NITU.  *See Caquelin* 959 F.3d at 1373 (indicating the government had not pointed to any evidence affirmatively indicating the railroad would have delayed abandonment had there been no NITU); *see also Sauer West*, 157 Fed. Cl. at 633–34; *Lowery*, 2023 WL 4677537, at *10 (citing *Sauer West* for the proposition the government must provide evidence affirmatively indicating the railroad would have delayed abandonment).  Authorization of track removal in the NITU is therefore a neutral factor.

### 5.    State Law

The fifth factor *Caquelin* considered was "evidence that the railroad in this case did remove track . . . [which was] a precondition to abandonment-based easement termination under Iowa law."  *Caquelin*, 595 F.3d at 1373.  The court found this track-removal factor, assessed in light of state law, to be evidence of the government's abandonment of the railway.  *Id.*  The government's actions, when viewed through the lens of state law, therefore supported a finding

of causation.  In the present case, the railroad could not remove the track during the period of the NITU due to the NHPA condition, and it did not remove the track after the NHPA condition was lifted.  *See supra* Section V.A.4; JSF at 5–6 (Nos. 21–32).  The mere fact the railroad did not remove the track, however, is not dispositive of causation because it is not necessarily an element of abandonment under Colorado law.  Track removal was important in *Caquelin* because, under Iowa law, it was a precondition to abandonment.  Here, Colorado law does not necessarily require removal as a precondition of abandonment.  *See* Tr. at 101:8–16 (the government stating it was "not aware of any [cases saying] the affirmative act [required in abandonment] must be pulling up the line"); *infra* note 5.  Analysis of track removal under relevant state law accordingly does not provide the same weight as in *Caquelin*.

The parties disputed at oral argument how much state law should influence the causation analysis outside of track removal.  Plaintiffs argued state law governs abandonment of an easement for the causation analysis.  *See* Tr. at 172:17–173:3 ("THE COURT:  Well, your argument, though, is that state law applies, so it's the last usage for railroad purposes, which would be the . . . day after the last sugar beet day.  [PLAINTIFFS]:  Yes. . . .  It was around 1979 or shortly thereafter.").  The government argued state law is not "the question," and can be looked at but not applied because ultimately the purpose of the STB scheme is to create uniformity in abandonment law.  Tr. at 177:17–22 ("[THE GOVERNMENT]:  If there were 50 different legal avenues for abandonment such that parts of rail lines would be abandoned in different places regardless of the [Interstate Commerce Commission ('ICC')] or the STB's decision as to abandonment, that would be at odds with the uniformity contemplated by Congress.").

State law does color the Court's abandonment analysis under *Caquelin*.  In *Caquelin*, the Federal Circuit noted track removal was a prerequisite for abandonment under state law.  *See Caquelin*, 595 F.3d at 1373 ("[T]here was evidence that the railroad in this case did remove track . . . , a precondition to abandonment-based easement termination under Iowa law."); *see also Preseault v. United States* (*Preseault I*), 494 U.S. 1, 22 (1990) (O'Connor, J., concurring) ("Although the Commission's actions may pre-empt the operation and effect of certain state laws, those actions do not displace state law as the traditional source of the real property interest.").  At oral argument, the parties agreed state law is an overarching consideration within the *Caquelin* analysis.  Tr. at 140:16–24 ("[PLAINTIFFS]:  It seems like the *Caquelin* court was looking to state law and what it said about abandonment and using that to then color its interpretation of intent to abandon as of the NITU's issuance.  In this case, there was a statute, and they looked at specific requirements under Iowa law.  Obviously, this case is not in Iowa, so we would look at Colorado abandonment and what that would mean."); Tr. at 145:3–10 ("[THE GOVERNMENT]:  [State law is] an overarching consideration of the circumstances of the case to answer the question that they set forth in this opinion[:]  whether the railroad would have abandoned in the absence of the NITU.").

Even if state law applies, the railroad notably has not taken steps to consummate abandonment under federal law.  *See infra* Section VI (addressing the extent of federal law preemption for railway abandonment).  As the Colorado Court of Appeals stated in a recent case

involving this same easement,[3] "The Welty Line . . . is part of the national rail network, which is regulated by federal law and . . . is currently under the jurisdiction of the . . . STB.  Rail lines that fall under the STB's jurisdiction cannot be abandoned (or converted to trails) without the STB's approval." *Sauer West, LLC v. Great W. Ry. of Colo., LLC*, No. 22CA0638, slip op. at 3 (Colo. App. May 11, 2023).  The current STB regime does not allow state law to override STB jurisdiction until the rail line has been abandoned through the STB process.  *Id.*  The Court accordingly looks to Colorado law, not as a dispositive factor of intent to abandon, but as one factor the Court must weigh with others.

As a preliminary matter, the parties disagree as to the requirements for abandonment under Colorado law.  Plaintiffs assert abandonment under Colorado law requires mere cessation of use.[4]  Tr. at 94:17–21 ("[PLAINTIFFS]:  When that interest—whenever the holder of that interest ceases to use that interest for its designated purposes, it ceases.  It's defeated.  That acquired interest is defeated under Colorado law.").  Cessation of use, according to plaintiffs, includes the easement no longer being used for its originally intended purpose.  *Id.*  On the other hand, the government argues Colorado law requires an affirmative act to abandon a rail line.[5]  Tr. at 89:22–90:2 ("[THE GOVERNMENT]:  . . . We don't agree that mere nonuse alone is enough.  THE COURT:  Okay.  Well, let's just say nonuse plus—well, you think there has to be some affirmative act?  [THE GOVERNMENT]:  Yes.").

Railroad abandonment under Colorado state law may be unclear, but the lack of clarity does not prevent the Court from reaching a conclusion on this factor.  The parties agreed at oral argument:  if the rail line was not under STB jurisdiction and Colorado law only required cessation of railroad operations, the easement was abandoned at least at the time the railroad filed its notice of exemption.  Tr. at 102:15–103:1 ("THE COURT:  Well, factually speaking, if

---

[3] The Colorado Court of Appeals case involved the same factual background as in this case and most of the same plaintiffs.  *See Sauer West, LLC v. Great W. Ry. of Colo, LLC*, No. 2022CA638, slip op. at 1–2 (Colo. App. May 11, 2023).  The plaintiffs requested declaratory judgment and quiet title for the easements.  *See id.*

[4] Plaintiffs cite *Lithgow v. Pearson*, 135 P. 759 (Colo. App. 1913) and *Barnes v. Winford*, 833 P.2d 756 (Colo. App. 1991), to support cessation of use as the standard for abandonment.  In the 1913 *Lithgow* case, the question before the Colorado Court of Appeals was "whether or not . . . a right of way acquired by a railroad corporation . . . reverts to the original owner of the fee upon the same being abandoned by the corporation."  *Id.* at 759.  The railroad in *Lithgow* obtained the right of way "for railroad purposes" and had abandoned the line, taken tracks up, and made no attempt "to use the old railroad right of way for public purposed of any sort."  *Id.*  The Colorado Court of Appeals held the right of way was abandoned and the land reverted back to the landowners when the railroad ceased using the right of way for its intended purposes.  *Id.* at 761.

[5] The government cited *Fruit Growers' Ditch & Reservoir Co. v. Donald*, 41 P.2d 516 (Colo. 1935), to argue "[m]ere non-use, no matter how long, is not sufficient to terminate an easement."  Gov't's Resp. at 31 n.16; *see* Tr. at 102:7–14 ("[THE GOVERNMENT]:  I don't know that we can presume the mere nonuse is enough, because there are cases more in the timeline of *Lithgow*—for instance, I looked to *Fruit Growers' Ditch*.  This is cited in footnote 16 of our opening brief that says, 'Mere nonuse is not enough to terminate an easement,' and that's from 1935, the Colorado Supreme Court.").  In *Fruit Growers'*, the Colorado Supreme Court confirmed "Abandonment must be proven by evidence of nonuse and intention to abandon.  Intention may be shown either expressly or by implication."  41 P.2d at 518 (quoting *S. Boulder Canon Ditch Co. v. Davidson Ditch & Reservoir Co.*, 288 P.177, 178 (Colo. 1930)).  The government also relies on *Allen v. Nickerson*, 155 P.3d 595, 601 (Colo. App. 2006), to support requiring an affirmative act for abandonment:  "To establish abandonment of an easement, it must be shown by the party asserting the abandonment that there were affirmative acts manifesting an intention on the part of the owner of the dominant estate to abandon the easement."  *Id.* (quoting *Gjovig v. Spino*, 701 P.2d 1267, 1269 (Colo. App. 1985))  The government highlighted the pulling up of tracks in the Colorado abandonment cases; however, the government was "not aware of any [cases saying] the affirmative act must be pulling up the line."  Tr. at 101:8–16.

the standard under state law is nonuse for railroad purposes plus taking all equipment out and not having it, then you would agree that the abandonment would have been sometime in the late seventies?  [THE GOVERNMENT]:  I think if that's the test, Your Honor, then, yes, you're right.  We don't see any evidence in this case of usage [between 1979 and 1990].").   The government's cited cases do not squarely address whether cessation of a railroad operations is enough to constitute abandonment under Colorado law.  First, in *Lithgow*, the Colorado Court of Appeals held a right-of-way was abandoned because it was not being used for its originally intended purpose.  *Lithgow v. Pearson*, 135 P. 759, 763 (Colo. App. 1913).  The court indicated a right-of-way "was liable to be defeated whenever it ceased to use the land for the purpose contemplated by our Constitution."  *Id.*  The court states the "tracks [had been] taken up," but the court does not rest its conclusion on this fact.  *Id.* at 759.  Instead, it relies on the lack of the railroad's "attempt . . . to use the old railroad right of way for public purposes of any sort."  *Id.* at 759–60.  Under the standard in *Lithgow*, the railroad's easement here would have been abandoned once the railroad ceased using the line in the 1970s.  The relevant deeds conveyed the right of way to the railroad for "a railway or tramway, from the town of Loveland to a point near the town of Berthoud, in said state for the *transportation of sugar beets and other property* . . . ." David T. Pulliam Deed at 1, ECF No. 187-1 (emphasis added).  The Notice of Exemption also explained, "[The railroad] constructed the Line sometime between 1901 and 1906 *primarily to serve the sugar beet industry in the area.  Subsequently, the Line was used to transport various agricultural products.  The Line, however, has not been used for over 20 years. . . .* [A]bandonment will not result in any change in rail operations."  Pls.' MSJ Ex. D, Notice of Exemption Sub-Ex. E, at 2 (emphasis added) (Historic Report).  At oral argument, the government concurred:  if cessation of usage is the standard—which *Lithgow* implies—the line was abandoned under state law at the time usage ceased.  Tr. at 102:15–24.  The government also cites to *Fruit Growers'* to support of its position, *see* Gov't's Resp. at 31 n.16 (citing *Fruit Growers' Ditch & Reservoir Co. v. Donald*, 41 P.2d 516, 517–18 (Colo. 1935)), but the case likewise does not require track removal for abandonment.  In *Fruit Growers'*, the Colorado Supreme Court indicated "mere" nonuse would not constitute abandonment, but "attendant facts and circumstances showing an intention on the part of the owner of the easement to abandon it" could evidence abandonment.  *Fruit Growers'*, 41 P.2d at 517 (quoting 1 Thompson on Real Property § 635, at 751 (1924)).  Here, the railroad's intent to abandon is evidenced by, as plaintiffs noted, the railroad "[r]emoving all of its equipment from the line for a significant number of years, decades."  Tr. at 99:8–10; *see also infra* Section V.A.6 (analyzing acts indicating abandonment).

Under either party's state-law abandonment standard, therefore—i.e., whether or not an affirmative act is required under Colorado law—the railroad has met the standard for abandonment under state law before the issuance of the NITU.[6]  The standard for abandonment

---

[6] The parties indicated at oral argument, however, a regulatory taking claim based on the Transportation Act of 1920's preemption of state law may have existed in the past, but such a claim is likely untimely.  Tr. at 52:11–17 ("[THE GOVERNMENT]: . . . I mentioned the . . . Transportation Act of 1920 being the source of the preemption, and it sounds like that's the preemption claims we're blaming for forestalling their interest.  That, of course, would be time-barred . . . ."); Tr. at 87:22– ("THE COURT: . . . [I]f the easement was permanently eradicated . . . when the railroad rolled a car onto the line in 2000 . . . doesn't that create a federal takings case, then? . . . [PLAINTIFFS]:  Hypothetically, if you're talking about a regulatory taking . . . ."); Tr. at 90:15–16 ("[THE GOVERNMENT]:  I think there could be an alleged regulatory taking claim that would accrue at that point in

is governed by federal law, but to the extent state law colors the abandonment analysis, it weighs in favor of abandonment. The government has not provided sufficient evidence indicating a lack of intent to abandon under state law. The factor of state-law abandonment therefore weighs in favor of plaintiff.

### 6.    Other Considerations in Causation

Weighing the same factors as *Caquelin*, the Court finds, on balance, inconclusive or neutral evidence of causation. *See supra* Section V.A.1–5. One factor weighs in favor of the government: timing of actual abandonment. Two factors weigh in favor of plaintiff: Notice of Exemption and state-law abandonment standards. Two factors are neutral: the NITU period and NITU authorization. *See id.* This analysis results in an inconclusive or neutral assessment. *Caquelin*, however, indicates the government can provide evidence of the railroad's intent to delay abandonment and thus defeat causation. *See Caquelin*, 959 F.3d at 1373 ("The government does not point to any evidence at all affirmatively indicating that the railroad would have delayed abandonment . . . had there been no NITU to interfere with the grant of authority of abandonment . . . . In the absence of any such evidence, there is no clear error in a contrary finding on the evidence of record in this case."). Actions also speak louder than words. The Court therefore assesses whether the government identifies sufficient evidence in this case to establish the railroad's intent to delay abandonment, absent the NITU. The standard articulated by the Federal Circuit is whether the railroad "had every intent to abandon the railroad line[] during the period of time that the NITU was in effect." *Memmer*, 50 F.4th at 145 (quoting *Memmer v. United States*, 150 Fed. Cl. 706, 748 (2020), *aff'd in part, vacated in part, and remanded*, 50 F.4th 136). Causation under *Caquelin* focuses on the intent of the railroad. *See* 959 F.3d at 1372. In *Caquelin*, the court indicated the government did "not point to any evidence at all affirmatively indicating that the railroad would have delayed abandonment . . . had there been no NITU." *Id.* at 1373. To determine whether causation is met, the Court accordingly turns to evidence of actions taken by the railroad affirmatively indicating intent to delay abandonment.

*Caquelin* does not establish a bright-line standard for an indication of abandonment under federal law. Instead, the Federal Circuit looked to factual indicia of abandonment in light of STB regulations. *See Caquelin*, 959 F.3d at 1372–73. In this case, when the Court asked the government for a statute, regulation, or caselaw defining federal abandonment, the government cited the STB regulations, as in *Caquelin*:

> THE COURT: What is the federal government standard for usage? What case?
> [THE GOVERNMENT]: I'm not aware of a specific case . . . . I don't know of any cases from the Federal Circuit, for instance, that says this is a use that supports a *Caquelin* argument. It's obviously only been a few years since *Caquelin* came down, and I'm not aware of any cases where we have had to legally address what a use is.
> . . . .
> THE COURT: So you said "must fulfill federal law for the purposes of

---

time . . . ."). The takings claim alleged here is based on a traditional takings theory seen in similar rails-to-trails cases, and the Court accordingly analyzes the case presented rather than a regulatory taking.

abandonment."  Does that just mean the STB proceeding?
[THE GOVERNMENT]:  Yes.

Tr. at 115:3–16; 116:18–21.  The government described the STB as the "exclusive authority on determining whether a line has been abandoned."  Tr. at 61:5–7; *see also* Tr. at 69:2–5 ("THE COURT: . . . [H]ow do I determine if there was abandonment?  [THE GOVERNMENT]:  By looking to the STB's regulations.").  The procedural formalities of the STB are indicia of this intent to abandon, but they are not a bright-line federal rule.  *See Caquelin*, 959 F.3d at 1372–73 (reviewing the notice of exemption, the extension of the NITU, the filing of the notice of consummation, the authorization of the NITU, abandonment under state law, and the government's lack of evidence "affirmatively indicating that the railroad would have delayed abandonment . . . had there been no NITU").  The Colorado Court of Appeals took a similar approach in its case regarding this rail line, looking to the STB's procedural formalities as well as the actions of the railroad.  *See Sauer West v. Great W. Ry. of Colo.*, No. 22CA0638, slip op. at 9 (Colo. App. May 11, 2023) ("To abandon a line under STB jurisdiction, a railroad must apply to the STB . . . .  'Until the STB relinquishes jurisdiction over a rail line,' however, 'state law is irrelevant.'" (quoting *Burnett v. United States*, 154 Fed. Cl. 539, 548 (2021))).

Review of older STB cases and those of its predecessor, the ICC, the Court notes a variety of railroad actions are reviewed and factors often draw distinctions between temporary discontinuance of a line verses complete abandonment.  Beginning with the current STB processes, since the adoption of 49 C.F.R. § 1152(e)(2) in 1997,

> a railroad is required to file a 'notice of consummation' with the agency within [one] year of the service date of the decision permitting abandonment to signify that it has exercised the authority granted and intends that the property be removed from the interstate rail network.  Under the regulation, a notice of consummation is deemed conclusive on the issue of consummation if there are no legal or regulatory barriers to consummation (such as outstanding conditions, including Trails Act conditions that permit rail banking and interim trail use on railroad rights-of-way that would otherwise be abandoned).

Consummation of Rail Line Abandonment That Are Subject to Historic Preservation and Other Environmental Conditions, 73 Fed. Reg. 22002, 22003 (April 23, 2008).  In other words, under the current STB framework, abandonment is complete with the filing of the notice of consummation.  Prior to requiring the filing of a notice of consummation, a railroad established intent to abandon through its statements and actions.  In *Black v. ICC*, the Court of Appeals for the District of Columbia stated, "a determination as to whether there is an 'abandonment' should involve a more searching and functional inquiry about the actual intent of the parties to the transaction than the bare formalities addressed by the Commission."  762 F.2d 106, 112–13 (D.C. Cir. 1985).  The Eighth Circuit characterized abandonment as "an intention of the carrier to cease permanently or indefinitely all transportation service on the relevant line"; other circuits have agreed.  *ICC v. Chi. & N.W. Transp. Co.*, 533 F.2d 1025, 1028 (8th Cir. 1976); *see Black*, 762 F.2d at 112–13 (collecting cases holding abandonment revolves around the intent of the railroad).  In *Birt v. Surface Transportation Board*, the Court of Appeals for the District of Columbia Circuit listed "several concrete actions which may indicate an intent to abandon:

cessation of operations, cancellation of tariffs, salvage of the track and track materials, and relinquishment of control over the right-of-way." 90 F.3d 580, 585–86 (D.C. Cir. 1996). Circuits have additionally acknowledged some actions may show intent to abandon while others merely show a temporary discontinuance of the line. *Id.* at 586 n.12 (distinguishing the intent to abandon with the intent to temporarily discontinue the line). A lack of effort to attract rail traffic on a discontinued line, for example, can be indicative of an intent to abandon. *Id.* (citing *Consol. Rail Corp. v. ICC*, 29 F.3d 706, 713 (D.C. Cir. 1994)). In summary, historical cases reveal a distinction between the intent to permanently abandon and to temporarily discontinue. Further, pre-consummation cases examined concrete actions to confirm intent of abandonment or discontinuance. *See, e.g.*, *id.* at 585–86. *Memmer*, a more recent decision on intent, also illustrates actions confirming intent. In *Memmer*, the railroad "engaged A&K to remove the rails on the line." *Memmer*, 50 F.4th at 143. As these cases indicate, however, there is no bright-line federal rule distinguishing intent to abandon and lack of intent.

Due to the lack of a bright-line federal standard, the Court returns to *Caquelin* and assesses any factual indicia which may distinguish this case. A first distinguishing fact is the railroad's extensions of authority to abandon. While actual consummation of abandonment is not necessary to the causation analysis, the length of time the railroad had authorization to abandon can be indicative of intent. *See Caquelin*, 959 F.3d at 1371. Pursuant to 49 C.F.R. § 1152.29(e)(2),

> A railroad that receives authority from the Board to abandon a line . . . shall file a notice of consummation with the Board to signify that it has exercised the authority granted and fully abandoned the line . . . . If, after 1 year from the date of service of a decision permitting abandonment, consummation has not been effected by the railroad's filing of a notice of consummation, and there are no legal or regulatory barriers to consummation, the authority to abandon will automatically expire.

The regulation requires authorization to abandon, and the authorization automatically expires after one year. *Id.* The railroad's authorization in this case began on 6 May 2008 with the automatic expiration of the authorization, absent an extension, set to occur on 6 May 2009. JSF at 2 (No. 2). The railroad extended its authorization for six years. *Id.* at 3 (No. 9). If the railroad had intended to abandon quickly, it likely would not have filed extensions for six years. If the railroad *had* intended to abandon, however, the railroad would not have stated in all requests for extension, "GWRC is continuing to explore *alternative options to consummating the abandonment of the rail line*, including various public uses of the corridor." *See* 19 May 2009 Request for Extension (emphasis added); 22 Apr. 2010 Request for Extension; 12 Apr. 2011 Request for Extension; 16 Apr. 2012 Request for Extension; 17 Apr. 2013 Request for Extension; 16 Apr. 2014 Request for Extension; 49 C.F.R. § 1152.29(e)(2). The extensions of authorization to abandon are affirmative evidence of the railroad's intent to explore other options rather than abandon the line. *See Caquelin*, 959 F.3d at 1373 (enumerating actions taken "indicating an affirmative intent to abandon"). The extensions are therefore some evidence, supplied by the government, supporting a finding of the railroad's intent to delay abandonment. *Cf. id.* (identifying the government's lack of "any evidence . . . affirmatively indicating that the railroad would have delayed abandonment").

The Court next surveys the railroad's concrete actions to determine if there was intent to permanently abandon or temporarily discontinue the line.  The parties jointly submitted a detailed, nine-page statement including a list of stipulated facts.  Those facts and undisputed facts from the record are reproduced below:

- From 1990 to April 2008, "the Line had no local or overhead traffic" and "there had been no maintenance in 2008."  JSF at 4 (No. 14).
- The railroad invested $1,462.73 in the Welty Line from 2008 through 2015.  *Id.* at 4 (No. 15).  Additionally, in 2003, the railroad "recorded an investment of $8,961" related to the rail line.  *Id.* at 4 (No. 16).
- There were various occasions from 2003 to 2004 and from 24 June 2007 to 13 April 2015 where the railroad "moved a small number of cars on the Line."  *Id.* at 4 (Nos. 17–18).
- In the April 2008 Notice of Exemption, the railroad stated, "Upon receipt of abandonment authority, GWRC intends to remove the rail, track materials, and cross ties."  Pls.' MSJ Ex. D, Notice of Exemption Sub-Ex. D at 1 (Environmental Report); *see* JSF at 4 (No. 19).
- During the NITU, the railroad was prohibited from removing track because of the historical preservation condition, but there is no evidence the railroad was making plans to salvage the track when the NHPA condition lifted.  NITU at 3; *see also* JSF at 2 (No. 5); *Memmer*, 50 F.4th at 143–45.
- From when the NHPA condition was lifted on 23 March 2009 until the end of the authorization to abandon the line, the track was not pulled up, but instead the railroad made track repairs.  *See* JSF at 3 (No. 8) ("March 23, 2009:  The STB removed the Section 106 historic preservation condition.").
- There are multiple instances where the railroad replaced, repaired, or maintained the rail line.  In October 2008, the railroad replaced "700 relay ties, switch ties, and spikes."  *Id.* at 4 (No. 20).  In November 2009, the railroad "replaced ties and repaired railroad crossing over County Road 13 in Johnstown, Colorado."  *Id.* at 5 (No. 21).  In February 2011 and March 2012, the railroad made track repairs and replaced ties following derailment caused by car storage activities.  *Id.* at 5 (Nos. 22–23).  On 24 August 2013, the railroad "removed crossing planks, regauged rail, applied foam tie plugs, and installed crossing planks."  *Id.* at 5 (No. 26); *see also* Tr. at 183:20–184:10 ("[THE GOVERNMENT]:  [The usage is] car storage, it's marshalling of cars, and on top of it, they're using the easement . . . by maintaining the tracks in their present location, and . . . there is vegetation spraying, there's weed maintenance, there's repairs.  For instance, . . . the NITU was in effect . . . June to December 2008, and in October 2008, they engaged . . . in a tie replacement project.  Remember in the next year, they replaced ties in a railroad crossing.  They replaced tracks and ties afterwards.  Those are not steps that show, absent a NITU, the railroad would have abandoned.  They are steps to maintaining the line.").
- From 2011 to 2013, the railroad spent "approximately $11,500" to "replace[] or repair[] ties and spikes."  JSF at 5 (No. 24).  In August 2013, the railroad spent $8,000 to "repair[] a bridge."  *Id.* at 5 (No. 25).
- Plaintiffs emphasized at oral argument the railroad had stopped paying taxes on portions of the easement.  Tr. at 192:12–15.  The declaration of Ms. Sauer, one of the

landowners, states "the Weld County Assessor . . . removed the railroad bed easement from my property descriptions in 2007, adjusted the total acreage, and added the acreage of the right-of-way to my assessed value.  As a result, I began paying the taxes on this additional acreage included within the right-of-way in 2007."  Pls.' MSJ Ex. B (Decl. of Cynthia Sauer) ¶ 12, ECF No. 187-2.  The government is unsure who is paying taxes on the remaining portions of the line.  Tr. at 192:16–193:1.

Cumulatively, the actions of the railroad may meet the standard for temporary discontinuance under *Birt* and other cases, but this standard is distinct from an intent to abandon.  *See Birt v. Surface Transp. Bd.*, 90 F.3d 580, 585–86 (D.C. Cir. 1996) (distinguishing intent to temporarily discontinue from intent to abandon).  The railroad's actions here evidence no intent to fully abandon the line during the time of the NITU.  The railroad made no effort to remove track, it performed nominal maintenance on the line, and it invested to repair the line and vital structures; these actions evidence a lack of intent to abandon the line.  *See Memmer*, 50 F.4th at 143–45; *Caquelin*, 959 F.3d at 1372–73.

Lastly, as an additional tool for understanding what abandonment entails, the Court turns to the plain meaning of abandonment.  The definition of "abandonment" suggests the term is in contrast with "use":  "relinquishment by a nonuser for a specified period (as of an easement)."  *Abandonment*, Webster's Third New International Dictionary (2002).  When asked for the federal standard of usage, the government was unable to identify cases defining what "is a use that supports a *Caquelin* argument."  Tr. at 115:3–16.  The parties also agreed use had to be railroad use but disagreed on what "railroad use" entailed.  During oral argument, the Court asked the parties if a single car on a 6.2-mile rail line would constitute use.  Tr. at 184:16–17.  The government argued it would, while plaintiffs disagreed.  *See* Tr. at 184:18–186:13.  The Court then asked if 2,357 rail cars stored on the track would constitute use.  Tr. at 186:14–15.  Plaintiffs still disagreed, asserting 2,357 rail cars on the line would not constitute railroad use.  Tr. at 187:22–24.[7]  Plaintiffs' briefing further attempts to support this position by citing STB caselaw.  Pls.' Resp. at 10–11 (first citing *Chelsea Prop. Owners—Abandonment—Portion of the Consol. Rail Corp.'s W. 30th St. Secondary Track in N.Y., NY*, 8 I.C.C.2d 773, 789–92 (1992); then citing *Tri-Cnty. Metro. Transp. Dist. of Or.—Abandonment—A Line of Burlington N.R.R. Co. in Wash., Cnty., Or.*, No. AB-6 (Sub-No. 348), 1993 WL 176653, at *1–2 (ICC May 26, 1993); and then citing *City of Chi., Ill.—Adverse Abandonment—Chi. Terminal R.R. in Chi., Ill.*, No. AB 1036, Fed. Carr. Cas. (CCH) ¶ 37338 (STB June 15, 2010)).  Plaintiffs reason the status quo of the rail line has always included nominal maintenance and car storage.  *See* Tr. at 111:2–13 ("[PLAINTIFFS]:  . . . [The] sporadic railcar storage . . . that's not enough, especially coupled with the Notice of Exemption and the language in [the Notice of Exemption] and then the subsequent NITU.").  Plaintiffs accordingly state when the railroad Notice of Exemption

---

[7] At oral argument, the Court further asked plaintiffs whether abandonment would occur if a railroad intended to abandon a line for transport operations but kept using it for storage of 2,357 cars.  Tr. at 182:22–183:5 (the Court posing the hypothetical).  Plaintiffs stated the line would be abandoned and the stored cars "would be an issue for state courts to resolve."  Tr. at 188:2–4 (plaintiff's counsel).  Finding a line with thousands of cars on it as "abandoned" but not controlled by federal abandonment regulations seems absurd, however.  If anything, thousands of cars existing on a railway evidences a *lack* of intent to abandon, at least under federal law.  *See* 49 C.F.R. § 1152.29(e)(2) (requiring a railroad to "file a notice of consummation with the [STB] to signify that it has exercised the authority granted and fully abandoned the line (e.g., discontinued operations, salvaged the track, canceled tariffs, and intends that the property be removed from the interstate rail network)").

certified the rail line had been abandoned for 20 years, the railroad disclaimed any nominal use, maintenance, or repair as use.  *Id.*  Plaintiffs similarly argue when coupled with the Notice of Exemption—which states the railroad intended to abandon the line—the car storage does not matter.  *Id.*  The government could not explain why the railroad did not use the rail line in prior years or why the railroad suddenly decided to forgo abandonment.  Tr. at 181:18–25 ("[THE GOVERNMENT]: . . . I can't explain why the railroad said that there was no usage in the prior 20 years when we have records indicating there was some. . . .  [I]t's not inconsistent with what we've seen that the line was not in particularly great shape, but to be able to move and marshal cars, the tracks obviously had to be in sufficient condition to do that . . . .").  If the railroad had intended to abandon, there would be no status quo of investment, maintenance, or repair.  These actions are indicative of only discontinuance and strengthen a finding of no abandonment.  *See Memmer*, 50 F.4th at 143; *Caquelin*, 959 F.3d at 1372–73; *see also Birt*, 90 F.3d 585–86.  When considered as a whole, the railroad's actions—listed extensively in this Section and the Joint Statement of Facts—indicate the government has supplied evidence strongly supporting an "affirmative[] indicat[ion] that the railroad would have delayed abandonment . . . had there been no NITU."  *Cf. Caquelin*, 959 F.3d at 1372–73 ("The government does not point to any evidence at all affirmatively indicating that the railroad would have delayed abandonment . . . , had there been no NITU to interfere with the grant of authority of abandonment . . . ."); *Sauer West*, 157 Fed. Cl. at 633–34; *Lowery*, 2023 WL 4677537, at *8 (citing *Sauer West* for the proposition "if takings plaintiffs provide evidence indicating the railroad's intent to abandon its corridor, the government must provide evidence affirmatively indicating that the railroad would have delayed abandonment beyond the NITU period").

### 7.     Conclusion on Causation

As the parties repeatedly stressed during oral argument, "[t]his is a unique case."  Tr. at 193:6–7.  State and federal law are in tension;[8] the railroad's intent at the time of the NITU contradicts some of the railroad's actions in the decades previous.  The railroad declared intent to abandon and non-use of the rail line, but the railroad invested, repaired, maintained, and stored rail cars on the line.  Under state law, it is likely the railroad would have abandoned the line when the last sugar beet died because the line was no longer being used for its intended purpose and the railroad removed the equipment associated with the sugar beet industry.

The Court is bound by *Caquelin* and must use the factors discussed in *Caquelin* as guideposts even though the case here is factually and procedurally distinct.  Earlier in litigation, the Court reiterated *Caquelin*'s reasoning, "[I]n the absence of evidence affirmatively indicating the railroad did not intend to abandon the line, there was sufficient evidence to support the trial court's ruling granting summary judgment in favor of the plaintiffs."  *Sauer West*, 157 Fed. Cl. at 633–34 (citing *Caquelin*, 959 F.3d at 1372–73).  Here, on balance, the factors addressed in *Caquelin* together result in a mostly neutral assessment.  *See supra* Section V.A.1–5.  In contrast to the railroad in *Caquelin*, however, the government further "point[s] to . . . evidence . . . affirmatively indicating that the railroad [in this case] would have delayed abandonment."  *See Caquelin*, 959 F.3d at 1373.  The actions of the railroad strongly indicate it would not have abandoned the line at the time of the NITU.  *See supra* Section V.A.6.  Due to this lack of intent to abandon, the Court finds there was no causation under Prong Two of *Preseault II*.  *See*

---

[8] The Court addresses the issue of state law and preemption *infra* Section VI.

*Caquelin*, 959 F.3d at 1372–73 (indicating the government may, but did not, "point to any evidence at all affirmatively indicating that the railroad would have delayed abandonment"); *see also Sauer West*, 157 Fed. Cl. at 633–34; *Lowery*, 2023 WL 4677537, at *8 (citing *Sauer West* for the proposition "if takings plaintiffs provide evidence indicating the railroad's intent to abandon its corridor, the government must provide evidence affirmatively indicating that the railroad would have delayed abandonment beyond the NITU period").

### B.    The Effect of the NHPA on Causation

Plaintiffs contend, "the government attempts to make the same argument regarding the NHPA that th[e] Court decisively already rejected—that an imposed NHPA condition meant the railroad could not have abandoned the Rail Line during the NITU's pendency, and therefore, causation is not satisfied." Pls.' Resp. at 1 (citing *Hippely v. United States*, 162 Fed. Cl. 414, 426 (2022), *appeal dismissed per stipulation*, 2023 WL 6393198 (Fed. Cir. 2023)). Plaintiffs aver, "[t]he government does not offer any new argument in this case aside from the fact that the STB imposed the historic preservation condition before, rather than after, the NITU's issuance. That is a distinction without a difference." *Id.* at 2. Plaintiffs assert, "[t]hat the NHPA condition came before the NITU is of no consequence; the NITU independently caused a taking, and therefore the government is liable." *Id.* at 3. Plaintiffs opine the "Court said it plainly: 'A concurrent NHPA historic preservation condition cannot extinguish what would otherwise be a taking.'" *Id.* (quoting *Hippely*, 162 Fed. Cl. at 429). Plaintiffs contend "the NHPA is completely divorced from causation analysis." *Id.* at 11.

The government contends the historic preservation condition on the rail line prevented GWRC from abandoning the line during the NITU period. Def.'s Cross-MSJ at 12. The government argues "[t]he Court's decision in [*Hippely*] does not lead to the conclusion that Plaintiffs have established causation here." *Id.* at 14 (citing *Hippely*, 162 Fed. Cl. 414). The government contends because "*Hippely* was wrongly decided" and the facts of this case are distinguishable from *Hippely*, the Court should not find causation here. *Id.* at 15. Specifically, the government argues the facts in this case differ from the facts of *Hippely* for two reasons. First, unlike in *Hippely*, "the STB imposed a historic preservation condition in a separate order that it issued before any trail sponsor even requested a NITU." *Id.* at 14. Second, the government distinguishes *Hippely* by noting "in *Hippely* the railroad consummated abandonment thirteen days after the STB removed the historic preservation condition. Here, Great Western never consummated abandonment." *Id.* (citation omitted). The government argues, because the historic preservation condition predated the NITU and the government never consummated abandonment, "this case shows that the NHPA process was separate and apart from the Trails Act process." *Id.*; *see* Tr. at 153:15–24 ("[THE GOVERNMENT]: . . . That analysis does not also allow for the removal of the NHPA condition when plaintiffs have not challenged it as the government action. It's a separate regulatory action that has its own bases in statute, and the plaintiffs were not challenging it, so the analysis should have been what would have happened in a non-NITU world, but with the NHPA condition, versus what happened in the real world.").

The government argues "*Hippely* was wrongly decided" for three reasons. Def.'s Cross-MSJ at 15. First, the government argues "[t]he Court was not free to remove the historic preservation condition to analyze causation." *Id.* at 16. "Second, the Court's causation analysis

improperly focused on the railroad's intent at the time of the NITU." *Id.*  Finally, "the Court in *Hippely* was wrong to infer any conclusions about causation from *Balagna*." *Id.* at 18.  The government argues "either because the facts of this case are distinguishable from the facts of *Hippely*, or because of the errors highlighted above, the Court should not conclude that its decision in *Hippely* compels a finding of causation here." *Id.*

The Court previously considered in *Hippely* whether the presence of a NHPA historic preservation condition negates the government's liability for a taking.  There, "[t]he STB issued the NITU and adopted a historic preservation condition in the same decision . . . .  The NITU period expired before the historic preservation condition was satisfied.  Shortly after the STB removed the historic preservation condition—the last obstacle to abandonment—the railroad formally abandoned the line." *Hippely*, 162 Fed. Cl. at 416.  The Court held "the presence of a dual NITU and NHPA condition can still result in a taking." *Id.* at 426.  The Court explained:

> The government cannot argue the abandonment delay was caused by the historic preservation condition when that condition outlasts the NITU, but simultaneously admit the government is liable as long as the historic preservation condition expires before the NITU.  If both the NITU and historic preservation condition existed together, as they did in this case, it is illogical for the "cause" to be whichever one expires last.  Causation is about intent and the conditions at the time of the NITU, not the order conditions expire. *Ladd*, 630 F.3d at 1023–24; *Sauer West*, 157 Fed. Cl. at 636.  If there is compensation for a taking when only part of the NITU period is also encumbered by a historic preservation condition, it follows the NITU period should be compensable, even if the condition lasts beyond the duration of the NITU.

*Id.*; *see also Lowery*, 2023 WL 4677537, at *10 (agreeing *Hippely*'s "analysis is sound" and reiterating "if compensation is owed when only part of the NITU period is encumbered by a historic preservation condition, then the entire NITU period should be compensable, even if the condition extends beyond the NITU's duration" (citing *Hippely*, 162 Fed. Cl. at 426)).

The facts in this case are distinct from *Hippely*.  Here, the question is whether the presence of a dual NITU and NHPA condition can still result in a taking if the historic preservation condition was issued prior to the issuance of a NITU and the railroad never consummated abandonment of the line.  The Court in *Hippely* found causation and therefore a taking.  162 Fed. Cl. at 429.  The Court here finds there is no causation.  *See supra* Section V.A.7.  As the government stated during oral argument, the NHPA condition issue is moot if the Court finds there is no causation under *Caquelin*.  Tr. at 154:16–19 ("THE COURT:  So if the *Caquelin* factors find against the taking, then the NHPA superseding issue is moot.  [THE GOVERNMENT]:  That would be the case.").  The Court therefore does not analyze the effect of an NHPA condition.

## VI.    Whether Prong Three of *Preseault II* Is Met

### A.    Applicability of Prong Three

Plaintiffs alternatively argue Prong Three of *Preseault II* creates liability under state law. The Prong Three inquiry requires the Court to assess "even if the grants of the Railroad's easements were broad enough to encompass recreational trails, [whether] these easements terminated prior to the alleged taking so that the property owners at that time held fee simples unencumbered by the easements." *Preseault v. United States* (*Preseault II*), 100 F.3d 1525, 1533 (Fed. Cir. 1996). The first clause of Prong Three requires the Court to assess *scope* (i.e., "even if the grant[] of the Railroad's easement[] [was] broad enough to encompass recreational trails"). The second clause requires the court to assess *abandonment* (i.e., whether the "easement[] terminated prior to the alleged taking so that the property owners at that time held fee simples unencumbered by the easements").

The first clause of Prong Three is not at issue: the parties do not dispute the railroad's easement encompasses only "railroad purposes" and does not extend to recreational trail use.[9] The parties instead disagree whether the abandonment can occur independent of the scope inquiry. Plaintiffs' argument effectively asks the Court to ignore the first clause due to the GWRC's abandonment of the railway. Pls.' Resp. at 13 ("[P]rong 3 [is] an alternative path to liability (even in circumstances where the scope of the easement does not encompass trail use).").

*Ellamae Phillips*, in accordance with the first clause of Prong Three, instructs the Court to consider abandonment only if the scope of the easement is broad enough to encompass trail use. *See Ellamae Phillips Co. v. United States*, 564 F.3d 1367, 1374 (Fed. Cir. 2009) (remanding for consideration of "whether the easement . . . covers trail use, and if so, whether the railroad terminated its right-of-way by abandonment"); *Ellamae Phillips*, 99 Fed. Cl. 483, 486 (2011) ("We are directed to consider whether the easement was abandoned *only* if we first decide that trail use is within the scope of the easement."); *Rogers v. United States*, 90 Fed. Cl. 418, 432 (2009) (same). If the scope of the easement does not extend to trail use, Prong Three is inapplicable. *See, e.g.*, *Ellamae Phillips*, 99 Fed. Cl. at 487 ("Since we have determined that trail use exceeds the scope of the easement, we have no need to address the contingent issue of abandonment."); *Lowery v. United States*, 167 Fed. Cl. 28, 42 (2023) ("The Court finds that any analysis of this prong is unwarranted. [Prong Three] of *Preseault* [*II*] applies when the grants of the railroad's easements were broad enough to encompass recreational trails. That is not the case here."). The parties agree the scope of the railroad's easement does not encompass trail use. Pls.' MSJ at 2 n.3; Def.'s Cross-MSJ at 24. The stipulation of scope indicates Prong Three does not apply. The Court therefore finds Prong Three is inapplicable and cannot support a takings claim here.

## B. Plaintiffs' Contention State-Law Abandonment Applies Notwithstanding the Easement's Scope

Despite Prong Three's scope requirement, plaintiffs nevertheless argue Federal Circuit precedent requires the Court to first determine whether GWRC abandoned the easement under

---

[9] The parties agree the easements here are for "railroad purposes" and do not encompass recreational trail use. *See* Pls.' MSJ at 2 n.3; Def.'s Cross-MSJ at 24; Tr. 27:14–20 "(THE COURT: So . . . no dispute over the scope of the easement? [PLAINTIFFS]: I don't believe so, Your Honor. THE COURT: [Does] the government agree? [THE GOVERNMENT]: Yes, Your Honor.").

state law.  Even if the easement did not originally encompass trail use, plaintiffs contend the railroad's abandonment of the railway under state law opens an "alternative path" to a takings claim under Prong Three.  Pls.' MSJ at 3.  Plaintiffs support their contention by reference to the text of *Preseault II*, *Hash*'s abandonment analysis, and *Ellamae Phillips*'s revisit of *Hash*.  *Id.* at 29–31.  The Court addresses each of these cases in turn.

Plaintiffs first claim the hypothetical analysis discussed in *Preseault II* supports their state-law theory.  Pls.' Resp. at 13.  *Preseault II* involved three parcels of land over which a railroad acquired rights-of-way.  100 F.3d at 1533–34.  The parties disputed whether the rights-of-way were held as easements or in fee simple.  *Id.*  The Federal Circuit, following remand from the Supreme Court, established the three-prong framework the Court applies here.  *See supra* Section III.A.  Under this framework, the court held the railroad owned the rights-of-way as easements over the plaintiffs' parcels.  *Preseault II*, 100 F.3d at 1534–37.  The court went further in its analysis, however, and additionally considered whether "[e]ven assuming for sake of argument . . . the so-called 'doctrine of shifting public use' is available," the easements were nevertheless abandoned prior to the shifted use.  *Id.* at 1544–49.  The "shifting public use doctrine" considered whether, under Vermont law, "the scope of the original easements, admittedly limited to railroad purposes, [was] properly construed . . . to include other public purposes as well."  *Id.* at 1541.  Under this hypothetical analysis, the court indicated, the plaintiffs "contend[ed] that under Vermont law the original easements were abandoned, and thus extinguished, in 1975.  If that is so, the State could not, over ten years later in 1986, have re-established the easement even for the narrow purposes provided in the original conveyances . . . ."  *Id.*  Concluding the hypothetical, the Federal Circuit stated, "we find the question of abandonment is not the defining issue, since whether abandoned or not the Government's use of the property for a public trail constitutes a new, unauthorized, use."  *Id.* at 1549.

Plaintiffs point to *Preseasult II*'s hypothetical under Vermont law, which they argue indicates the Court should perform a state-law abandonment analysis before any Prong Three scope inquiry.  Pls.' Resp. at 13.  The Federal Circuit's hypothetical in *Preseault II*, however, does not indicate abandonment under state law can trump the Prong Three scope inquiry.  The court's hypothetical conclusion made no reference to state abandonment proceedings taking precedence over scope.  The hypothetical relied on "shifting public use," which the government is not proposing here.  *Preseault II*, 100 F.3d at 1544–49; Tr. at 28:2–6 ("THE COURT: . . . The government's not arguing anything about a shifting public use doctrine here, right?  [THE GOVERNMENT]:  No, Your Honor.").  Even if *Presault II* did imply the state law inquiry comes first, however, plaintiffs admitted the hypothetical analysis was—at best—*dicta*.  Tr. at 32:8–17 ("THE COURT:  . . . [T]he *Preseault II* case does not hold the law as you're trying to apply it now.  [PLAINTIFFS]:  No, I would not call that a holding.").  The *Preseault II* analysis, therefore, does not stand for the broad proposition plaintiffs claim and does not require a state-law abandonment analysis before assessing scope.

Plaintiffs next contend the railroad's abandonment in *Hash* is equivalent to GWRC's abandonment in this case.  Pls.' MSJ at 30.  *Hash* considered whether a railroad's easement over public land reverted to the United States or the plaintiffs.  *Hash v. United States*, 403 F.3d 1308, 1312–13 (Fed. Cir. 2005).  After the United States granted the railroad an easement, the United

States passed the Homestead Act of 1875, which granted property surrounding the railroad's easement to homesteaders. *Id.* at 1312. When the railroad discontinued the line in 1995, the United States claimed it retained a reversionary right in the land, while the homesteaders—referred to as "Category 1" plaintiffs—asserted they held the land in fee, subject to the railroad's easement. *Id.* at 1313. Looking at the 1875 Act, the Federal Circuit determined the homesteaders obtained the property subject to the right-of-way because the grant did not reference any reversionary interests. *Id.* at 1318.

Plaintiffs argue the *Hash* court's recognition of the railroad's abandonment indicates abandonment is an "alternative path" to a takings claim under Prong Three. *Hash*, however, dealt with title to the land and not whether state-law abandonment permitted a taking. The Federal Circuit stated "[t]he primary issue [was] whether the claimant landowner owns the estate underlying the Railroad right-of-way, or whether the underlying estate never left its ownership by the United States, or whether the estate was deeded in fee to the Railroad." *Hash*, 403 F.3d at 1312. The issue in *Hash* was therefore not whether state-law abandonment allowed future trail use to constitute a taking; *Hash* addressed title to the land serving the easement. *Id.* at 1318 ("We conclude that the land of Category 1 is owned in fee by the landowners, subject to the railway easement."). The Federal Circuit instructed the district court to "determine just compensation" on remand (i.e., it found takings liability), but the Federal Circuit did not address whether the abandonment occurred under state or federal law. *See id.* Plaintiffs' analogy to *Hash* therefore fails, as *Hash* did not decide the issue presented here: whether state-law abandonment comes before Prong Three's scope analysis. *Hash* only addressed whether—upon abandonment and eventual trail use—a taking occurred. *Id.* ("We conclude that the land of Category 1 is owned in fee by the landowners, subject to the railway easement. . . . On remand the district court shall determine just compensation . . . .").

Finally, plaintiffs argue the Federal Circuit's analysis in *Ellamae Phillips* confirms their own interpretation of *Hash*. Pls.' MSJ at 30–31. *Ellamae Phillips* addressed a similar issue to *Hash* and considered the extent of *Hash*'s holding as applied to other 1875 Act land grants. *Ellamae Phillips*, 564 F.3d at 1368. In *Ellamae Phillips*, a railroad ceased operations on its railway easement in the 1980s, and in 1998 the ICC gave authority to a new entity to convert the railway into a trail. *Id.* at 1369. Prior to appeal, this court—applying *Hash*—determined the 1875 Act by its terms granted the plaintiff a reversionary interest in the land, and this interest vested once the railroad abandoned the line in the 1980s. *Id.* at 1370–71. The Federal Circuit vacated the order and remanded, holding: (1) the easement under the 1875 Act did not constitute a taking per se; and (2) *Hash* did not preclude an assessment of whether the easement's scope encompassed trail use. *Id.* at 1373–74. The Circuit instructed this court to determine "the dual questions whether the easement in this case covers trail use and, if so, whether the railroad terminated its right-of-way by abandonment." *Id.* at 1374. It also noted the abandonment determination of *Hash* was "limited to the facts of that case." *Id.* On remand at this court, Judge Baskir held the railroad's easement did not encompass trail use and accordingly directed the entry of judgment for the plaintiff. 99 Fed. Cl. at 487–88. In addressing abandonment, Judge Baskir stated, "Since we have determined that trail use exceeds the scope of the easement, we have no need to address the contingent issue of abandonment." *Id.*

Plaintiffs highlight the Federal Circuit's statement, "*Hash II* was decided as a question of abandonment" as evidence *Hash* requires a preliminary state-law abandonment analysis before scope. Pls.' MSJ at 30 (quoting *Ellamae Phillips*, 564 F.3d at 1373). Like in *Hash*, however, when the *Ellamae Phillips* court concluded *Hash* was a question of abandonment, it did not address the question of whether abandonment occurred independent of a scope inquiry. Instead, the Federal Circuit instructed this court to consider *scope before abandonment* on remand: "the dual questions whether the easement in this case covers trail use *and, if so,* whether the railroad terminated its right-of-way by abandonment." *Id.* (emphasis added). The court's statement abandonment in *Hash* was "limited to the facts of that case" further confirms this instruction. *See id.* at 1374. Judge Baskir's opinion on remand followed this order of operations, indicating its finding on scope resulted in "no need to address the contingent issue of abandonment." 99 Fed. Cl. at 487. Plaintiffs therefore cannot contend *Ellamae Phillips* considered abandonment under state law, because the case merely confirmed the order of operations is to first consider scope and then consider abandonment.

Plaintiffs contend each of the above cases supports an order of operations requiring the Court to apply state law on abandonment before—or regardless of—assessing the easement scope. *Preseault II*, *Hash*, and *Ellamae Phillips* do not support plaintiffs' theory because none of the cases were presented with the issue of whether state law can control over a scope analysis.[10] Each of the cases addressed separate questions on liability and did not conclude a state-law abandonment inquiry should come before the scope analysis. The cases therefore do not support plaintiffs' argument GWRC's state-law abandonment gave rise to a takings claim here.

### C.   Federal Law Preemption

#### 1.   Whether federal statutory railroad abandonment preempts state-law abandonment

---

[10] While this case was pending, but after oral argument, the Federal Circuit issued an opinion in *Stimson v. United States*, No. 2022-1201, slip op. (Fed. Cir. Oct. 2, 2023). There, a railroad decided not to repair a damaged rail line and eventually executed a trail-use agreement. *Id.* at 4. In contrast to the easement here, the Federal Circuit determined the deed in *Stimson* "plainly cover[ed] unrestricted reasonable use" rather than restricting the easement to railroad purposes. *Id.* at 7. Relying exclusively on Oregon caselaw, the court assessed whether the railroad had abandoned the easement before the NITU period. *See id.* at 11. The court determined plaintiff's evidence—including the railroad's filing a notice of intent to abandon with the STB—was not "clear and convincing evidence that the Railroad abandoned the easement [pursuant to Oregon law]." *Id.* at 12. The Federal Circuit characterized plaintiff's evidence of abandonment as "directed to potential abandonment *for railroad use only*," and "intent to discontinue railroad use alone [cannot] constitute [abandonment under Oregon law]." *Id.* The Federal Circuit's state-law focus further supports the inapplicability of Prong Three when scope is not in dispute. *See supra* Section VI.A (discussing the first clause of Prong Three). To the extent the second clause of Prong Three applies here, *Stimson* does not necessitate an identical state-law abandonment analysis. GWRC's easement in this case encompasses only railroad use. *See supra* note 9. *Stimson* does not require Prong Three abandonment to rest exclusively on state law. Instead, the Federal Circuit's decision indicates state abandonment law may be appropriate when an easement encompasses more than just railroad use. *See Stimson*, slip op. at 12. Indeed, the court characterized the railroad's notice of abandonment and lack of track repair as evidence of "*potential* abandonment" of railroad use alone. *Id.* (emphasis added). The court did not need to assess the preemptive effect of federal railroad legislation because the easement there encompassed more than railroad use. The Court here accordingly need not ignore federal preemption, as the easement in this case is limited to railroad use alone.

Plaintiffs argue the federal statutory scheme does not prevent a takings claim here because "determination of state-law abandonment in Plaintiffs' takings case must be determined under Colorado law, and it has nothing to do with the fact that federal law preempts the actual abandonment of the right-of-way."  Pls.' MSJ at 32.

Congress addressed preemption of railroad right-of-way abandonment under 49 U.S.C. § 10501(b)(2).  Under the statute, the STB controls all abandonment proceedings until the railroad abandons the line under federal law, and its jurisdiction is exclusive over state law.[11]  The Federal Circuit confirmed this interpretation in *Memmer II*:

> Appellants argue that, because § 1152.29(e)(2) requires the filing of a notice of consummation of abandonment, but does not mandate the filing of that notice as of the date state law abandonment requirements are met, the regulation had the effect in this case of extending [the railroad's] easements and therefore the taking of Appellants' property, for an additional period.  We reject this argument. . . .  [This] would *effectively contradict the STB's plenary authority to regulate abandonment* . . . .

50 F.4th 136, 146–47 (Fed. Cir. 2022) (emphasis added) (footnote omitted), *reh'g en banc denied*, No. 21-2133 (Fed. Cir. Mar. 14, 2023) (per curiam).

The Supreme Court has further addressed the broad authority of the STB under 49 U.S.C. § 10501(b)(2).  In *Chicago and North Western Transportation Co.*, the Supreme Court emphasized "[t]he exclusive and plenary nature of the Commission's authority to rule on carriers' decisions to abandon lines is critical to the congressional scheme, which contemplates comprehensive administrative regulation of interstate commerce."  *Chi. & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 321 (1981).

The Federal Circuit has also noted the STB's exclusive authority over abandonment: "While state law generally creates the property interest in a railroad right-of-way, 'the disposition of reversionary interests [is] subject . . . to the [STB's] "exclusive and plenary" jurisdiction to regulate abandonments' of railroad rights of way."  *Barclay v. United States*, 443 F.3d 1368, 1374 (Fed. Cir. 2006) (citations omitted) (quoting *Preseault v. ICC* (*Preseault I*), 494 U.S. 1, 8 (1990)).  The court continues, stating, "Federal law dictates when abandonment occurs. . . .  Abandonment cannot occur until authorized by federal law, and the NITU precludes abandonment and the reversion that would follow if abandonment were consummated. . . .  Thus, there could be no abandonment until authorized by federal law."  *Id.* (citations omitted).

Finally, the Colorado Court of Appeals recently agreed the STB's authority is exclusive over regulatory authority for this specific rail line.  In *Sauer West v. Great Western Railway*, the

---

[11] 49 U.S.C. § 10501(b)(2) states in full:

> The jurisdiction of the [STB] over . . . the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State, is exclusive.  Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

Court of Appeals stated, "The Welty Line . . . is part of the national rail network, which is regulated by federal law and . . . currently under the jurisdiction of the . . . STB[]. Rail lines that fall under the STB's jurisdiction cannot be abandoned (or converted to trails) without the STB's approval."  No. 22CA0638, slip op. at 3 (Colo. App. May 11, 2023) (footnote omitted).

The binding and persuasive caselaw *supra* presents wide consensus on the scheme's preemption of railway abandonment proceedings.  State law cannot effect abandonment because Congress specifically preempted these procedures to the extent indicated in 49 U.S.C. § 10501(b)(2).  As in *Burnett*, plaintiffs' reliance on state law for Prong Three puts the "cart before the horse" by failing to recognize federal abandonment as the exclusive means of abandonment.  *See Burnett v. United States*, 154 Fed. Cl. 539, 548 (2021).  GWRC's abandonment under state law therefore cannot support its takings theory in this case.

### 2.   Whether abandonment under Prong Three depends upon a distinction between federal-law abandonment and state-law abandonment

Plaintiffs contend Prong Three concerns only state abandonment law, which they argue is distinguishable from federal abandonment law.  Pls.' MSJ at 29.  Plaintiffs state, "Courts have long recognized the distinct separation between state law abandonment and federal abandonment, and that the latter has nothing to do with analysis and determination of the former."  *Id.*  According to plaintiffs, federal-law abandonment preempts "actual abandonment of the right-of-way," which they describe as "removal of the rails and ties and the consummation of abandonment by the railroad."  *Id.* at 32.  In contrast, plaintiffs assert state-law abandonment addresses "whether adjacent landowners own the underlying fee in a railroad corridor, . . . [and] whether state contract law triggered adjacent landowners' reversionary interests in the corridor." *Id.*  Plaintiffs "readily agree[]" federal law governs actions such as trespass, ejectment, and adverse possession.  Tr. at 20:6–11.  Plaintiffs, however, argue state-law abandonment, under plaintiffs' definition, is not preempted for purposes of Prong Three.  *See* Pls.' MSJ at 32.

To support the distinction between federal and state abandonment, plaintiffs indicate "the STB itself agrees with the myriad and wide-ranging decisions that separate federal preemption from a state court's determinations of property rights pursuant to state law."  *Id.* at 33.  Plaintiffs quote one STB decision, which states:

> [The party] has argued in the state appellate court that federal preemption under 49 U.S.C. § 10501(b) bars the state courts from ruling on state property law issues concerning property subject to this agency's licensing proceedings.  That argument is clearly incorrect.  Although federal preemption is broad, the [STB] has consistently held that disputes concerning state contract and property law should be decided by the appropriate courts with expertise in those matters, rather than by the [STB].

*Id.* (emphasis omitted) (quoting *Eastside Cmty. Rail, LLC—Acquisition & Operation Exemption—GNP Rly Inc. Ballard Terminal R.R. Co., LLC—Lease Exemption—Eastside Cmty. Rail, LLC*, Fed. Carr. Cas. (CCH) ¶ 37504 (STB Mar. 7, 2022)).

As discussed *supra* Section VI.C.1, 49 U.S.C. § 10501(b)(2) explains Congress's authority over railway abandonment.  The statute indicates Congress has preempted *all* abandonment procedures for railways, reciting:  "[t]he jurisdiction of the [STB] over . . . the . . . abandonment . . . is exclusive. . . .  [T]he remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law."  The statute leaves no room for a distinction between "actual abandonment" and "abandonment of a right-of-way." *See Chi. & N.W. Transp.*, 450 U.S. at 321 ("The exclusive and plenary nature of the Commission's authority to rule on carriers' decisions to abandon lines is critical to the congressional scheme.").

STB regulations also address abandonment.  The sole method for a railroad to abandon a railway is via agency proceeding. *Id.*  As explained by the STB itself:

> Since 1997, under the Board regulation at 49 C.F.R. 1152.29(e)(2), a railroad is required to file a "notice of consummation" with the agency within 1 year of the service date of the decision permitting abandonment to signify that it has exercised the authority granted and intends that the property be removed from the interstate rail network.

Consummation of Rail Line Abandonments That Are Subject to Historic Preservation and Other Environmental Conditions, 73 Fed. Reg. 22002, 22003 (April 23, 2008).  The regulation's exclusive authority over abandonment makes no distinction between state and federal abandonment.  Plaintiffs' single citation to an STB decision, *Eastside Community Rail*, even though not binding on this court, still does not indicate otherwise.  In *Eastside Community Rail*, the STB considered a request to reopen a previous STB ruling during the pendency of a related state-court case.  Fed. Carr. Cas. (CCH) ¶ 37504.  The state-court issue was not railway abandonment, however, but instead ownership and transfer of a railway easement. *Id.*  Plaintiffs quote a portion of the STB's decision confirming state courts' ability to determine ownership and transfer property rights.  Pls.' MSJ at 33 (quoting *Eastside Cmty. Rail*, Fed. Carr. Cas. (CCH) ¶ 37504).  The "disputes concerning state contract and property law" therefore were not relevant to state-law abandonment. *See Eastside Cmty. Rail*, Fed. Carr. Cas. (CCH) ¶ 37504.  The excerpted STB statement, in context, does not conflict with federal preemption of railroad abandonment.

Federal Circuit caselaw further references the exclusivity in the context of federal abandonment authority.  In *Memmer II*, for example, the Federal Circuit determined no taking occurred between the end of the NITU period and the filing of the consummation of abandonment.  50 F.4th at 147.  The court found there was no taking before consummation because "it is always the railroad's choice that ultimately impacts the duration of the taking." *Id.*  If the circuit found there was a taking before the railroad filed its consummation of abandonment, this "would *effectively contradict the STB's plenary authority to regulate abandonment*." *Id.* (emphasis added).  In *Memmer II*, the railroad's "choice" to abandon occurred when it filed its notice of consummation of abandonment—indicating no state-law abandonment principles are at play in in the consummation of abandonment. *Id.*

The Colorado Court of Appeals likewise addressed the lack of limitations on federal authority over abandonment on this very line: "[B]ecause the STB retains jurisdiction over the abandonment of the line pursuant to § 10501(b), the [Colorado] district court lacks jurisdiction to enter a declaratory judgment or to rule on a quiet title action as framed in the complaint because these state-law remedies are preempted by § 10501(b)." *Sauer West*, slip op. at 13 (Colo. App. May 11, 2023). The court refused to allow state-law principles to govern when abandonment authority has been preempted by federal law. In sum, the controlling caselaw and persuasive authority indicate no distinction exists between state-law abandonment and federal-law abandonment within a Prong Three analysis.[12]

### 3.    Whether *Toews*, *Caldwell*, *Barclay*, *Illig*, and *Ladd* support applying state abandonment law

Plaintiffs cite *Toews* to urge the Court to apply state law here. In *Toews*, the Federal Circuit considered an easement sold by a railroad to a city. *Toews v. United States*, 376 F.3d 1371, 1372–73 (Fed. Cir. 2004). The original landowner had granted an easement for a "proposed Railroad." *Id.* at 1376. After completing ICC abandonment proceedings, the city converted the railway into a trail. *Id.* at 1374. When plaintiffs filed a complaint with this court, the government argued state law prevented a taking under the doctrine of "shifting public use" under California law. *Id.* at 1377; *see also supra* Section VI.B (defining the doctrine of shifting public use). The Federal Circuit affirmed the trial court's finding on liability, concluding

---

[12] The ICC has notably modified the regulatory framework since *Presault II* was decided. *See* 49 C.F.R. § 1152.29. The scheme now requires a railroad receiving authority to abandon a line to "file a notice of consummation with the" STB to signify its abandonment. *See id.* § 1152.29(e)(2). The government stated at oral argument, "[In] the current regulatory framework and in light of the passage of time from *Preseault [II]*, I don't think we're likely to see the factual circumstances giving rise to a . . . successful Prong Three claim." Tr. at 65:14–18. To the extent current regulations foreclose any remedy, however, these regulations apply when an easement is broad enough to encompass trail use under Prong Three. *See supra* Section VI.A. Even if the Court were to agree with plaintiff state law controls under Prong Three, there still would be no taking. The railroad has met the standard for abandonment under Colorado law at the time it stopped using the railway to transport sugar beets. *See supra* Section V.A.5. Since that time, the railroad has used the line to store cars and reactivate the line. *See* JSF at 4–6 (Nos. 17–32). Either the railroad's continued use of the line may have led to an adverse possession claim or the statutory and regulatory changes may have led to a regulatory takings claim. Plaintiffs did not pursue either action, however, and these claims are likely time-barred. *See* Tr. at 174:14–175:21 (THE COURT: Let's assume railcar storage is a usage, but . . . from 1979 until . . . 1999, there wasn't even railcar storage. . . . [I]s there an adverse possession issue where the railroad . . . adversely possessed its own easement? . . . [PLAINTIFFS]: Well, they couldn't [bring a claim] because of federal preemption, so they couldn't really bring in a laches argument . . . . [THE GOVERNMENT]: . . . [A]ll the more reason that any claim about preemption . . . had accrued before. . . . [T]hey needed to have already brought the takings claim that their rights to kick the railroads off was taken from them in the regulatory preemption context."); Tr. at 87:21–88:13 ("THE COURT: . . . [I]f the easement was permanently eradicated . . . doesn't that create a federal takings case, then? [PLAINTIFFS]: Hypothetically, if you're talking about a regulatory taking . . . ."); Tr. at 90:15–16 ("[THE GOVERNMENT]: . . . [T]here could be an alleged regulatory taking claim that would accrue at that point in time . . . ."). The Court decides here only the question of whether state abandonment law is preempted by federal laws governing railroad abandonment, not whether the facts here give rise to any other cause of action. Plaintiffs argue finding federal preemption here would result in the "landowners in this case . . . hav[ing] no remedy." Tr. at 42:18–25 ("[PLAINTIFFS]: . . . [O]ur landowners in this case would have no remedy if—as we've stipulated . . . fee title to the underlying railroad[:] [Prong One] met. Prong Two[:] the trail use exceeded the scope of the easement, but then also we can't consider whether the line was abandoned pursuant to state law such that their reversionary interests would be triggered when the NITU issue[d].""). The Court regrets the outcome to the extent current binding precedent mandates such a result.

California caselaw on the doctrine of shifting public use did not permit a railway easement to shift trail use. *Id.* at 1379. Plaintiffs admitted at oral argument "*Toews* was a scope case" and "merely cited . . . to say where there is a gap in state law or where state courts decline to exercise their jurisdiction to opine on the matter, [the Court of Federal Claims] can take it upon themselves to make those determinations." Tr. at 106:16–22. The parties, however, agree scope is not at issue here, *see supra* Section VI.A, and plaintiffs are not arguing a theory of shifting public use, *see supra* Section VI.B. The Court therefore need not look to state law for abandonment when a federal statute preempts the abandonment procedure.

Plaintiffs further cite the *Caldwell*, *Barclay*, *Illig*, and *Ladd* line of cases to argue the NITU blocked state-law reversionary interests and therefore, "in [Prong Three] takings cases, is an established finding of liability." Pls.' MSJ at 35–36. None of these cases, however, stand for the proposition state-law reversionary interests take precedence over federal law. As the Court stated previously:

> *Caquelin* clarifies that causation was always an implied element of the Federal Circuit's precedents in *Caldwell*, *Barclay*, and *Ladd* because those cases are based on *Caldwell*'s holding that a "Fifth Amendment taking, if any, under the Trails Act is accomplished when an NITU is issued and state law reversionary interests that would otherwise [have] take[n] effect pursuant to normal abandonment proceedings are forestalled." *Caquelin*, 959 F.3d at 1371 (quoting *Caldwell*, 391 F.3d at 1236). The Federal Circuit applied this holding in, *Barclay*, a Trails Act case involving a statute of limitations issue. *Barclay*, 443 F.3d at 1374. In *Barclay*, the Federal Circuit held a NITU triggers accrual of a Trails Act claim and adverted to the plaintiff's admission that "the easement continued in existence beyond the time when it otherwise would have been abandoned." *Id.* (citation omitted). Then in *Ladd*, the Federal Circuit found a taking under the Fifth Amendment occurred despite a trail-use agreement never being reached because "a takings claim accrues on the date that a NITU issues, events arising after that date . . . cannot be necessary elements of the claim." *Ladd*, 630 F.3d at 1024.

*Sauer West LLC v. United States*, 157 Fed. Cl. 619, 633–34 (2022). The Federal Circuit decided each of these cases before *Caquelin* outlined the causation standard for a taking during a NITU period and does not indicate state abandonment law applies to the exclusion of the federal statutory scheme. The cases therefore do not affect the present inquiry into federal versus state law.

### 4. Whether finding state law is preempted would "trample on state sovereignty"

Plaintiffs finally cite Justice O'Connor's concurrence in *Preseault I* as a warning preemption in this case "would trample on state sovereignty." Pls.' MSJ at 31–32. Plaintiffs recite many quotes, including Justice O'Connor's statement, "Although the Commission's actions may pre-empt the operation and effect of certain state laws, those actions do not displace state law as the traditional source of the real property interests . . . ." *Id.* at 31 (emphasis omitted) (quoting *Preseault I*, 494 U.S. at 22 (O'Connor, J., concurring)). Plaintiffs argue

Justice O'Connor's concern with the suspension of state property rights supports a federalism concern with preemption of railroad abandonment under state law. *Id.* at 32.

In *Preseault I*, the question presented to the Court was whether "a federal 'rails-to-trails' statute under which unused railroad rights-of-way are converted into recreational trails notwithstanding whatever reversionary property interests may exist under state law." *Preseault I*, 494 U.S. at 4. The Court did not reach the merits of the takings claim, however, as it first considered whether Congress had withdrawn the Court of Federal Claims's jurisdiction over takings claims through amendments to the Trails Act. *Id.* at 12. The unanimous Court agreed the Tucker Act still provided a remedy after Congress passed these amendments, and the Court did not assess whether a taking had occurred because plaintiffs had not exhausted their remedies at the Court of Federal Claims. *Id.* at 12–17.

Justice O'Connor wrote separately to note a concern with federal procedures which fully block state *reversionary interests in property* and accordingly "displace state law as the traditional source of the real property interests." *Id.* at 22 (O'Connor, J., concurring). Justice O'Connor noted a concern with the circuit court's conclusion "the ICC's actions forestalled petitioners from possessing the asserted reversionary interest, and thus that no takings claim could arise." *Id.* at 20. Justice O'Connor's concurrence differentiates a regulation which "*burdens and defeats* [a] property interest" versus one which "*suspends or defers* the vesting of those property rights." *Id.* at 22 (emphasis added). Preventing the vesting of these property rights, Justice O'Connor notes, "would convert the ICC's power to pre-empt conflicting state regulation of interstate commerce into the power to pre-empt the rights guaranteed by state property law." *Id.*

Unlike plaintiffs' statement in their brief, Justice O'Connor's concurrence does not indicate a concern with federal preemption of railroad abandonment itself: the "delay[ing] property owners' enjoyment of their reversionary interests," the concurrence notes, is merely *burdening and defeating* existing interests, not *suspending or deferring* the vesting of those interests in the first place. *Id.* Justice O'Connor approvingly highlighted how abandonment in the railway interacts with state law:

> States may not impose obligations upon carriers at odds with those governed through the ICC's "exclusive" and "plenary authority to regulate . . . rail carriers' cessations of service on their lines." A State may again exercise its regulatory powers once the ICC authorizes a carrier's abandonment of service, and . . . "brings [the Commission's] regulatory mission to an end."

*Id.* at 21–22 (citations omitted) (first quoting *Chi. & N.W. Transp.*, 450 U.S. at 323; and then quoting *Hayfield N.R.R. Co. v. Chi. & N.W. Transp. Co.*, 467 U.S. 622, 633 (1984)). Justice O'Connor's concern may be more acute in this case if, for example, the regulations prevented the vesting of any reversionary interests at all, but the concurrence does not indicate federal-abandonment preemption of state-abandonment law itself threatens state sovereignty. *See id.* at 21–22; *see also supra* note 12 (addressing plaintiffs' argument federal preemption would leave no remedy). State law still controls after the STB's jurisdiction concludes. *See supra* Section

VI.C.1.  Giving the concurrence the non-binding but persuasive authority it is due, the Court accordingly finds preemption does not pose the federalism issues plaintiffs submit.

## VII.    Conclusion

In this case, the Court finds the government has pointed to evidence affirmatively indicating the railroad did not intend to abandon the line, indicating no causation under Prong Two of *Presault II*.  Prong Three is likewise inapplicable because the original easement was not broad enough to encompass trail use, and plaintiffs cite no cases supporting an application of state-law abandonment.  The parties agree if the evidence indicates no causation under Prong Two and if Prong Three is inapplicable, then, pursuant to *Presault II*, there is no takings liability.[13]  The Court accordingly finds no takings liability.  The Court therefore **DENIES** plaintiffs' Motion for Summary Judgment, ECF No. 187, **GRANTS** the government's Cross-Motion for Summary Judgment, ECF No. 190, and **ACCEPTS** the Joint Statement of Facts, ECF No. 197, despite the deficiency.[14]  The Court **DIRECTS** the Clerk to enter judgment for the government accordingly.

**IT IS SO ORDERED.**

s/ Ryan T. Holte
RYAN T. HOLTE
Judge

---

[13] *See* Tr. at 207:11–14 ("[PLAINTIFFS]:  If the Court determines [Prong Three is] not an alternative path to liability and finds no causation, then that would be the end of the case as far as liability is concerned."); Tr. at 208:2–6 ("[THE GOVERNMENT]:  . . . I agree . . . .  If there's no causation and no Prong Three availability, there is no liability, and the United States is entitled to judgment.").
[14] *See supra* note 1.